The appellant, Gary Eugene Walker, was convicted of capital murder and was sentenced to life imprisonment without parole. Six issues are raised on appeal. Our review of these issues convinces us that Walker's conviction should be affirmed.
The evidence presented by the State tended to establish that on the morning of June 7, 1985, Deputy Frank Aplin of the Mobile County Sheriff's Department stopped a vehicle driven by the appellant in the vicinity of Creel Road and Old Pascagoula Road for running a red light. Deputy Aplin observed that appellant was driving a blue Toyota pickup truck with a white toolbox attached to the rear bed and that a *Page 530 
logo of some kind appeared on the driver's door. Deputy Aplin asked appellant why he was in such a hurry. Appellant replied that he had been out all night and that he needed to go to his home nearby and take a shower and get ready for work because he was already late for work. Deputy Aplin did not arrest him, but just told him to be more careful and watch his driving habits. He observed appellant turn into a driveway on the lefthand side of Creel Road, further south from where he had been stopped.
Around 6:00 o'clock that same morning Kimberly Laird, who lived at 6405 Creel Road, was awakened by two gunshots coming from next door at the house of her in-laws, Felix Laird and Eleanor Whitley Moore Laird. She looked out the window toward her in-laws' house and saw a little blue truck with white letters on the door. A man ran to the truck, got in it, and left. She could not positively identify the man, but he resembled appellant, the stepson of Felix Laird. She made two phone calls, one to Madge Bishop, appellant's mother, and one to her own mother. Kimberly Laird then went next door and found that Felix and Eleanor Laird had been shot. Felix Laird was wearing street clothes. Eleanor Laird was nude. Kimberly Laird then called the sheriff's office to report the incident.
Deputy James Hunn of the Mobile County Sheriff's Department was the first officer to arrive at the victims' house, which was on Creel Road. He arrived around 6:00 a.m. When he approached the house, he saw a white male (Felix Laird) lying in the doorway and a white female (Eleanor Laird) inside the house, six to eight feet from the door. By that time, Deputy Alton Neidhardt had arrived. Deputy Neidhardt observed that Felix Laird appeared to have been shot in the stomach. Eleanor Laird was nude, and Deputy Neidhardt could see numerous holes in her extending from her knees to her breasts. Unlike Felix Laird, Eleanor Laird was still alive, but she appeared to be very weak and in a great deal of pain. She repeatedly asked Deputy Neidhardt if she was going to die. Deputy Neidhardt tried to reassure her as best he could. He also asked her if she knew who shot them, and she said, "yes, it was Felix's stepson, Gary Walker."
Ron Diegan, also with the Sheriff's Department, was called to the scene. When he arrived, Eleanor Laird was being treated by paramedics. He took photographs of the area and asked Eleanor Laird some questions about the incident. She told him her name was Eleanor Moore and that Gary Walker shot her and Felix. Mr. Diegan recorded these questions and answers on his tape recorder and later had the conversation transcribed. Eleanor Laird was then taken to the hospital, where she died in surgery as a result of her wounds.
Meanwhile Deputy Aplin was still patrolling the area. While he was stopped at a traffic light on Old Pascagoula Road, a blue Toyota pickup came up directly behind him. The driver of the truck appeared to be the same person he had stopped earlier. The truck caught his attention because of the short period of time since he had stopped appellant for running a red light. When the light turned green, Deputy Aplin went south on Theodore Dawes Road, while appellant proceeded east on Old Pascagoula Road. Some three to five minutes later, Deputy Aplin heard a radio message that an assault with a weapon had occurred on Creel Road, so he put out the description of the subject and vehicle he had just stopped that had been in a hurry to get to Creel Road. At some point later, Deputy Aplin went to a trailer park on Highway 90 at Tillman's Corner, where he saw a blue Toyota pickup with a white toolbox that appeared to be the same one he had seen that morning.
Between 6:00 and 6:15 that morning, Leamon Edward Baxley was leaving his house at Gibson and Wigfield Roads in Tillman's Corner when he saw a blue pickup truck with a sign on the door approaching. The driver of the truck slammed on the brakes, stopped the truck, then got out and threw a shotgun into the bushes across the street from his front yard. After Mr. Baxley saw the gun being thrown away, he called the sheriff's office to report the incident. He stood out in the street and directed traffic away from the area where the *Page 531 
gun was, in order to preserve the tire tracks and any other evidence. Sergeant Charles Paquet of the Sheriff's Department responded to Mr. Baxley's call and recovered a Remington 1100 model 12-gauge shotgun from a little wooded area across from Baxley's house. The weapon was examined for any possible fingerprints. Mr. Baxley picked the appellant out of a photographic lineup that same day, but at trial said he could not positively recognize the person if he saw him in court.
Paul Spann, a friend of appellant's, saw appellant on the morning of the shooting. Sometimes when appellant had no place to stay, appellant would stay with him in his trailer at Plaza Mobile Home Park on Highway 90. On several occasions appellant would come in and sleep on the couch without Paul Spann ever knowing about it, since he rarely locked his doors. Sometime around 7:00 that morning, appellant woke him and said that "he had blown Felix and Eleanor away." Paul Spann rolled over and told appellant to get out because he thought it was just another one of appellant's wild stories and did not believe it. Shortly thereafter, Paul Spann got up and prepared to go to work. The keys to his company truck — a blue 1981 Toyota pickup with a white toolbox — were lying on the counter or coffee table, just as they usually were. He did notice later that morning, however, that the radio was turned off, which was unusual, because he never turned it off. Paul Spann learned of the Lairds' deaths later that day. Paul later talked with his brother Frank, who had stored a Remington 1100 12-gauge shotgun and some other items in the guest bedroom of Paul's trailer. Paul and Frank went to the trailer and looked in the bedroom for Frank's gun. The gun was missing. Paul Spann also kept a rifle and some ammunition in his trailer. He noticed that a lot of his ammunition was missing. Paul Spann thought the brand of the missing ammunition was Sears Ted Williams high velocity "fours." After Paul and Frank Spann discovered that the shotgun and ammunition were missing from the trailer, they contacted David Laird, Felix Laird's son and the appellant's half-brother, and they all went to the sheriff's office. All three men had heard appellant make remarks indicating ill will toward Felix Laird. All three men had also observed that appellant became loud and obnoxious when drinking and had often spoken of "getting even" with people — including Felix Laird — but that to their knowledge appellant had never followed through on such statements.
Detective Willie Edward Estes of the Sheriff's Department was the person in charge of investigating the Lairds' deaths. When he arrived at the Laird residence that morning, Eleanor Laird had already been taken to the hospital, but several officers had otherwise secured the crime scene. Felix Laird's body was still lying in the doorway. Detective Estes also found two expended 12-gauge hulls lying in the yard, a plastic wadding just inside the front door, and a felt-type wadding further inside near a foyer wall. He also found numerous striation marks on the front door and down the left side of the living room wall. Detective Estes took the two expended shells and waddings and gave them to Dale Carter at the State Department of Forensic Sciences to be examined. He also went to the trailer where Paul Spann lived and took two 12-gauge Sears brand shotgun shells, which he also sent to Dale Carter for analysis. Detective Estes also received the tape recording Detective Diegan had made of his conversation with Eleanor Laird, which he sealed and put in a file on the shooting. As part of his investigation, Detective Estes also prepared a photographic lineup, which was shown to Leamon Baxley to see if he could identify appellant as the person he saw dispose of the shotgun. Unlike Mr. Baxley, however, Detective Estes could not recall the specific date Mr. Baxley was shown the photographic spread. He could only say that it was within two weeks of the shootings.
Various forensic experts analyzed the evidence gathered as a result of Detective Estes's investigation. Dr. Leroy Riddick, a state medical examiner, performed an autopsy on both victims and confirmed that the cause of death in each case was a *Page 532 
shotgun wound or wounds. He recovered numerous pellets from each corpse, which he turned over to Dale Carter. Brian Delmas and Deputy Mark Stoke, fingerprint experts with the Department of Forensic Sciences and the Mobile County Sheriff's Department respectively, both identified fingerprints and palm prints taken from the Remington 1100 shotgun as matching the right ring fingerprint and right palm print of the appellant. Dale Carter, also with the Department of Forensic Sciences, examined the Remington 1100 shotgun, the pellets sent to him by Dr. Riddick, and the various items of evidence collected by Detective Estes, including two empty hulls, two unfired shells, a shot collar, and a paper shot shell wad. He performed tests on the various items of evidence. He said that when he received the weapon it had three live rounds in it, two Winchester double aught buckshot and one Sears Ted Williams number four. Mr. Carter examined the two empty hulls found at the scene and determined that they had at one time been worked through the mechanism of the Remington 1100 shotgun he had examined — to the exclusion of all the other weapons in the world — but he could not positively determine that the waddings and shot were fired from that particular weapon. However, when he looked at those shells he did not see anything that would indicate the shells had been in another gun.
The appellant denied ever having threatened to kill Felix Laird and said he would not have hurt Felix for "nothing in the world." He told the authorities that on the date in question he had been out drinking since the previous night and remembered nothing about being stopped by Deputy Aplin, going to Paul Spann's trailer, going to Felix and Eleanor Laird's house, or getting a gun and shooting anyone. He maintained that while he was out drinking, someone slipped some kind of drug in his drink for some unstated reason.
 I
Appellant first contends that the trial court erred in allowing the State to go into the details of a prior difficulty between Felix Laird and himself. Specifically, he contends that the sole purpose of such testimony was to arouse the passion of the jury and thereby deprive him of his constitutional right to a fair trial.
In a charge of a crime, "the state may prove former acts of hostility by the accused towards the victim for the purpose of showing motive in the accused. . . . The general rule. . . is that the moving party may show the fact, but not the details of the former difficulty." C. Gamble, McElroy's AlabamaEvidence (3d ed. 1977); see also Twilley v.State, 472 So.2d 1130, 113435 (Ala.Cr.App. 1985);Davis v. State, 331 So.2d 813, 817 (Ala.Cr.App. 1976).McElroy's, however, goes on to state:
 "The demarcation between the fact, or highlights, of a former difficulty and its details is a tenuous and vague division. It is impossible to draw a clear line of demarcation between details or merits of a difficulty and what might be called the broad outlines of the difficulty. The very minute that a party proceeds to introduce evidential data to show the general nature of a former difficulty he, of necessity, must show some data additional to the bare fact of the occurrence. Because of this difficulty in distinguishing between the fact of and the details of a former difficulty, the modern decisions hold that a great measure of discretion should be vested in the trial court in the determination of such a distinction. Consequently, the rule now seems to be that the extent to which facts of a former difficulty may be proved is committed in measurable degree to the discretion of the trial court."
McElroy's Alabama Evidence, supra, § 45.06(2);see also, Davis v. State, supra, 331 So.2d at 817. "The trial judge is vested with wide discretion in deciding how far counsel may go in eliciting 'details of a former difficulty'; he should be allowed to determine when to let counsel run and when to rein him in." Crittenden v.State, 476 So.2d 626, 628 (Ala.Cr.App. 1983).
The basis of appellant's complaint concerns the following excerpt from the record: *Page 533 
 "Q. Let's just talk about let's say the preceding year before the deaths of Felix and Eleanor Laird. Had you had occasion over that time period to hear Gary Walker make any remarks that indicated ill will toward Felix Laird?
"A. Yes, sir.
 "Q. What remarks of that nature have you heard him make?
"A. Well, he told me approximately —"
 MR. PENNINGTON: Object to all this, Your Honor, as not being probative. I don't know the relevance of it.
"MR. COPELAND: Goes to motive.
"THE COURT: Overrule.
"MR. PENNINGTON: Except.
"Q. Go ahead, sir.
 "A. He told me that he was upset with Felix over an income tax check that he — was delivered to Felix' house, Felix Laird, and he had not received it. He thought Felix had taken it and cashed it and kept it from him.
 "Q. How long before the Lairds were killed did he tell you this?
"A. Approximately two weeks to a month.
 "Q. And what did he act like when he told you that?
"A. He was upset.
 "Q. Now, other than that specific statement, going back to what I asked you a minute ago, over the approximately course of a year before the homicides, had you had occasion to hear Gary Walker during that year make remarks to you indicating ill will toward Felix Laird?
 "A. Yes, sir. He had been kicked out or put out by Felix for various reasons —"
 THE COURT: Tell us — You were asking what remarks he's heard?
"MR. COPELAND: Yes, by Gary Walker.
 "A. Yeah, he's told me that he was upset or angry with Felix over him putting him out, not letting him stay with him."
Our review of the record convinces us that the prosecutor did not go into the details or particulars of the prior difficulties any more than was necessary to show the general nature of the difficulties between appellant and the deceased, Felix Laird. We find that the trial court exercised its discretion prudently with regard to this issue. Therefore, no reversible error exists.
 II
Appellant also contends that the trial court erred in allowing a witness, Leamon Edward Baxley, to testify that he picked out his photograph from a photo spread shown to him on the same day the murders took place. Specifically, he argues that the witness was shown a biased and suggestive photograph spread which gave rise to a substantial likelihood of irreparable misidentification, and thus that his pretrial identification of appellant should have been suppressed.
"[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson v.Braithwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253,53 L.Ed.2d 140 (1977); see also, Minor v. State,437 So.2d 651, 654 (Ala.Cr.App. 1983); Jackson v. State,414 So.2d 1014, 1017 (Ala.Cr.App. 1982). In determining the reliability of identification testimony, the factors to be considered are: (1) the opportunity of the witness's to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the time between the crime and the identification. Phillips v. State, 462 So.2d 981, 988
(Ala.Cr.App. 1984); Flowers v. State, 402 So.2d 1088,1092 (Ala.Cr.App.); cert. denied, 402 So.2d 1094
(Ala. 1981).
Our application of these factors to the present case persuades us that the identification procedure used here was not suggestive. Even if it was somewhat suggestive, it was not suggestive to the degree that its reliability would be undermined and its admissibility tainted. See Nance v.State, 416 So.2d 437 (Ala.Cr.App. 1982). The witness's opportunity to see appellant at the time he threw the shotgun into the bushes was good. He testified that he was about to get into his car that morning when *Page 534 
he saw appellant throw the gun into the bushes just across the street from where he was. The witness's degree of attention was obviously good, because he stopped what he was doing when appellant slammed on his brakes and stopped his truck. He said he noticed the man jump out of the truck "so [he] just watched" appellant dispose of the weapon and then called the sheriff's office immediately. Though not overly detailed, the witness's prior description of appellant was accurate and clear. He told the officer that the man he saw was about average height, had light hair, a light complexion, and was wearing blue jeans and a T-shirt. This description is sufficient to indicate that the witness had observed the man for a sufficient period of time to pick him out of a photo spread. Moreover, the witness exhibited a high level of certainty when he identified the appellant's picture as the picture of the person he had seen disposing of the shotgun. He told the officer "that's him" or "that one" when he picked out appellant's photograph. Finally, the brevity of the time frame between the crime and the witness's view of the photographs — the witness picked appellant's photograph out of the spread on the same day he witnessed the event — strongly suggests a reliable identification. Thus, the criteria for determining the admissibility of the photographic display were met and complied with.
The Supreme Court said in Manson that against the aforementioned factors is to be weighed the corrupting effect of the suggestive identification itself. Manson,supra, 432 U.S. 114, 97 S.Ct. at 2253. There is no indication from the record before us that the witness was pressured or coerced, or that the detective who brought the photographs hinted or suggested a response from the witness, thus factually distinguishing the instant case from Oakleyv. State, 457 So.2d 459 (Ala.Cr.App. 1984), a case which appellant cites in support of his position. Here, the witness was simply told to look at the pictures and see if he saw the person who threw the gun away. He was shown six photographs of people with the same general characteristics as appellant. Moreover, these photographs all had the same background, thus making the photographs shown to the witness fairly uniform. Therefore, the factors concerning the witness's ability to make an accurate identification were not outweighed by any corrupting effect of a suggestive identification procedure itself. We conclude, therefore, that the trial court did not err in allowing the witness to testify that he had picked appellant out of a photographic spread.
Appellant also contends that the pretrial identification of him should have been suppressed because his retained attorney was not advised of the photographic spread, thus denying him his constitutional right to counsel. Such a contention is meritless.
"[T]here is no right to counsel at a preindictment photographic array conducted as part of the identification process for the purpose of permitting a witness to attempt to identify the perpetrator of the crime." Tate v. State,435 So.2d 190, 196 (Ala.Cr.App. 1983); see also Marks v.State, 424 So.2d 1342 (Ala.Cr.App. 1982).
 ". . . It has been consistently held in Alabama that a pre-prosecution lineup in the absence of counsel for an accused does not violate his Sixth Amendment right to effective counsel or his Fourteenth Amendment right to due process.
 "In McGee v. State, Ala.Cr.App., 383 So.2d 881, 882 (1980), writ denied, 383 So.2d 884, it is stated:
 " 'The appellant contends he should have been provided counsel at his preindictment lineup and failure to do so violates his Sixth Amendment right to assistance of counsel. Consequently, he contends the victim's in-court identification should have been suppressed. The appellant's contention is without merit. A preindictment lineup is not a stage of an adversary judicial criminal proceeding at which the right to counsel attaches as defined in Moore v. Illinois, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). See also Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Hammons v. State, Ala.Cr.App., 371 So.2d 986 (1979).' *Page 535 
 "In considering the same question presented here, but in a situation in which appellant therein was in a more favorable position than here, as a warrant had been issued for the arrest, it was held in Lomax v. Alabama, 629 F.2d 413 (5th Cir. 1980), that in the absence of prosecutorial involvement in procuring the warrant, no constitutional violation occurred in conducting a lineup without affording the arrested accused the benefit of counsel."
Marks v. State, supra, 424 So.2d at 1343.
Here, the witness made his initial identification of the person he saw dispose of the gun on the evening of the same day he viewed the incident. Clearly, appellant had not yet been indicted, nor had any prosecutorial proceedings begun. Therefore, appellant was not entitled to be present or have counsel present when the witness viewed the photographic spread. Thus, no error was committed by the trial court in denying appellant's motion to suppress.
 III
Appellant next contends that it was error for the trial court to admit the photographic spread into evidence because: (1) its admission only served to bolster the witness's identification; and (2) one could reasonably infer that he had a prior criminal record from the photograph of him.
As to appellant's first allegation, we would simply note that because the witness was not able to make an in-court identification of the appellant, admission of the photo spread could not bolster an event which never took place. Thus, as no in-court identification was made, the issue of the reliability and admissibility of the pretrial identification must be evaluated as a separate issue with regard to its admissibility. The issue of its reliability and the factors to consider have been discussed previously and therefore will not be repeated here.
As to appellant's second allegation, that one could reasonably infer that he had a prior criminal record, from the mug shot of him used in the photographic spread, we note that appellant's objection at trial to the admission of the photo spread made no mention of the idea that since it was a mug shot the jury could infer that he had a prior criminal record. The only objection made to the admission of the photo spread was that it only served to bolster the witness. All grounds of objection not specified are waived. Blackmon v. State,449 So.2d 1264, 1266 (Ala.Cr.App. 1984). Appellant is bound by his specified objections, Bolding v. State,428 So.2d 187, 191 (Ala.Cr.App. 1983), and it is too late for him to raise new grounds of objection.
Moreover, even if this issue had been preserved for appellate review, we would hold that admission of the photographic spread did not constitute reversible error. The prerequisites to ruling that the introduction of mug shot type photographs does not result in reversible error are: (1) the prosecution must have a demonstrable need to introduce the photographs; (2) the photographs themselves must not imply that the defendant has a prior criminal record; and (3) the manner of introduction of the photographs at trial must be such that it does not draw particular attention to the source or implications of the photographs. United States v. Harrington,490 F.2d 487, 494 (2d Cir. 1973).
Our examination of the record convinces us that these prerequisites were met in the instant case. There was a demonstrable need to introduce the photographs, because the witness declined to make an in-court identification of the appellant and there were no other witnesses to the incident to which this witness testified. The investigating officer took pains to cover up any marks which identified the photographs as mug shots. Each of the photographs was stapled to a backing. A cover sheet with circles cut out so that only the heads of the individuals could be seen was then placed over the photographs. Moreover, the prosecution's introduction of the photographs was not made in such a way as to draw particular attention to the source or implications of the photographs. No mention was made of the fact that these were mug shots. The witness merely *Page 536 
testified that the photographs were shown to him by Detective Estes, the person in charge of investigating the shooting, which was necessary to establish a proper predicate for the admission of the photographic spread. Thus, this case is factually disginguishable from Holsclaw v. State,364 So.2d 378 (Ala.Cr.App.), cert. denied, 364 So.2d 382
(Ala. 1978), wherein we held that because the State did not have a demonstrable need to introduce the mug shots, in light of two reliable in-court identifications, because the mug shots depicted the defendant in such a way that the jury could reasonably infer that he had a prior record, and because the manner of introduction drew particular attention to the mug shots, the introduction of the mug shots into evidence constituted reversible error. Therefore, in the present case the trial court did not err in admitting the photographic spread into evidence.
 IV
Appellant next contends that the evidence adduced at trial is insufficient to support his conviction of capital murder. Specifically, he argues that the State was required to prove that he intentionally killed two or more persons by one or a series of acts, but did not do so because of the State's failure to prove that he intentionally killed Eleanor Laird. Viewing the State's evidence presented to the jury, which is set out above, in light of the principles enunciated inCumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978),cert. denied, 368 So.2d 877 (Ala. 1979), we find that, even though the evidence is circumstantial, when viewed in the light most favorable to the prosecution it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. The State's evidence established the following: Appellant was stopped by Deputy Aplin early on the morning of June 7, 1985, while on his way to a house on Creel Road. Appellant exhibited no signs of drunkenness. Kimberly Laird, who lived next door to Felix and Eleanor Laird, was awakened by two gunshots around 6:00 a.m. She saw someone resembling appellant run from the Lairds' house to a blue truck with white writing on the door and drive away. When she went next door to investigate, she found that Felix and Eleanor Laird had been shot. Leamon Baxley saw a person in a blue truck with a white toolbox throw a shotgun into the bushes across from his house around 6:00 or 6:15 that morning. He later picked appellant's photograph out of a photographic lineup as the person he saw dispose of the gun. Around 7:00 that morning appellant woke Paul Spann and told him he had blown away Felix and Eleanor. Paul Spann later discovered that someone had been in his company truck — a blue 1981 Toyota pickup with a white toolbox on the back and white lettering on the doors — and that his brother Frank's Remington 1100 12-gauge shotgun, plus some Sears Ted Williams ammunition, was missing from his trailer. This same gun was the one which Mr. Baxley saw thrown away and which was later determined to have been the weapon which fired two shells at the Laird house. Appellant's finger and palm prints were found on the shotgun. Clearly, the evidence was inconsistent with any reasonable theory of innocence. Indeed, all material circumstances in the evidence pointed to appellant's guilt. Thus, we find that the evidence was sufficient to sustain the appellant's conviction.
With regard to appellant's contention that he was so intoxicated that he lacked the ability to form the requisite specific intent necessary to constitute the offense of capital murder, our examination of the evidence convinces us that the jury was not required to find that appellant lacked the requisite intent.
 "It is true that the degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to 'insanity.' Maddox v. State, 31 Ala. App. 332, 334, 17 So.2d 283, 285 (1944). Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Gautney *Page 537 v. State, 284 Ala. 82, 222 So.2d 175
(1969); Walker v. State, 91 Ala. 76, 9 So. 87 (1891). Partial intoxication will not avail to disprove the specific intent; the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrong — stupefaction of the reasoning faculty. Green v. State, 342 So.2d 419 (Ala.Cr.App. 1977).
 "However, it is equally clear that the degree of intoxication exhibited by an accused, such as to reduce murder to manslaughter, even where the evidence is in sharp conflict, is for the jury to decide. Helms [v. State, 254 Ala. 14, 47 So.2d 276, 281 (1950)]; Chatham v. State, 92 Ala. 47, 9 So. 607 (1891); Maddox, supra."
Crosslin v. State, 446 So.2d 675, 681-82
(Ala.Cr.App. 1983). Here, the jury resolved the issue against appellant, apparently believing the testimony of Paul Spann and Deputy Aplin, which indicated that appellant was neither drunk nor under the influence of alcohol at the time of the shooting. Since the jury had before it sufficient evidence to support its resolution of this issue and to warrant its finding of guilt, appellant's contention that the State failed to present sufficient evidence upon which to base a conviction for capital murder is without merit.
 V
Appellant also contends that the trial court erred in not instructing the jury on murder as a lesser included offense of capital murder. However, included in § 13A-6-2, Code of Alabama 1975, are three different types of murder: intentional murder; reckless murder; and felony-murder. From the language contained in appellant's brief, however, we conclude that appellant is arguing that the trial judge should have instructed the jury on reckless murder as defined in § 13A-6-2(a)(2), Code of Alabama 1975. We cannot agree with this contention.
The appellant was charged with capital murder under § 13A-5-40(a)(10), Code of Alabama 1975, which reads as follows:
 "(10) Murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct;"
Regarding "murder," as that word is used in this State's capital murder statute, § 13A-5-40(b), Code of Alabama 1975, provides as follows:
 "(b) Except as specifically provided to the contrary in the last part of subdivision (a)(13) of this section, the terms 'murder' and 'murder by the defendant' as used in this section to define capital offenses mean murder as defined in section 13A-6-2(a)(1), but not as defined in section 13A-6-2(a)(2) and (3). Subject to the provisions of section 13A-5-41, murder as defined in section 13A-6-2(a)(2) and (3), as well as murder as defined in section 13A-6-2(a)(1), may be a lesser included offense of the capital offenses defined in subsection (a) of this section."
Finally, § 13A-5-41, Code of Alabama 1975, provides as follows:
 "Subject to the provisions of section 13A-1-9(b), the jury may find a defendant indicted for a crime defined in section 13A-5-40(a) not guilty of the capital offense but guilty of a lesser included offense. Lesser included offenses shall be defined as provided in section 13A-19(a), and when there is a rational basis for such a verdict, include but are not limited to, murder as defined in section 13A-6-2(a), and the accompanying other felony, if any, in the provision of section 13A-5-40(a) upon which the indictment is based."
Regarding these statutory provisions together, we conclude that the murder charged in § 13A-5-40(a)(10) is intentional murder as defined in § 13A-6-2(a)(1), and at the time these statutes were written reckless murder as defined in §13A-6-2(a)(2) could be a lesser included offense of the intentional murder charged in the capital offense,provided the requirements of § 13A-1-9, which defines lesser included offenses, were satisfied.
Since then our Supreme Court, however, has determined that under § 13A-1-9, reckless murder is not a lesser *Page 538 
included offense of intentional murder. Washington v.State, 448 So.2d 404 (Ala. 1984). Since, underWashington, reckless murder is not a lesser included offense of intentional murder of two or more people, which was the capital offense charged in the present case, the trial court was correct in not charging the jury on reckless murder.
Moreover, the facts in this case do not support a charge of reckless murder, since a reckless murder charge is not applicable where the acts resulting in death are directed to one or more particular persons, as was the case here.McCormack v. State, 431 So.2d 1340, 1341 (Ala. 1983);Northington v. State, 413 So.2d 1169, 1170
(Ala.Cr.App. 1981), writ quashed, 413 So.2d 1172 (Ala. 1982).
 VI
Appellant's final contention of error is that his sentence of life imprisonment in the penitentiary without parole is disproportionate to the crime committed and constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. Although appellant acknowledges that we have previously held on numerous occasions that a sentence of life without parole in capital cases does not constitute cruel and unusual punishment and is not disproportionate to the crime committed, he requests that this court reconsider its opinion with regard to this issue.
We see no reason to do so. Appellant's sentence was within the limits defined by the punishing statute; therefore, no error is preserved for appellate review and this court is without jurisdiction to review the punishment on the grounds it is disproportionate. German v. State, 492 So.2d 622,625 (Ala.Cr.App. 1985); Maye v. State, 472 So.2d 688,690 (Ala.Cr.App. 1985); Lee v. State, 449 So.2d 1277,1278 (Ala.Cr.App. 1984). Certainly, for this deed appellant's punishment could have been fixed at death. Thus, reversal on the basis of this issue is absolutely unjustified.
Therefore, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.