The appellant, Easton Darris Mullis, Jr., was convicted of murder made capital by § 13A-5-40, Code of Alabama 1975. The trial court, following a jury trial, sentenced the appellant to life imprisonment without the possibility of parole. Five issues are raised on appeal.
The evidence as presented by the State tended to establish that the appellant, Easton Darris Mullis, Jr., was married to Virginia Gail Mullis and that they lived with their four children in the State of Georgia. Mrs. Mullis and the victim in this case, James Edward Nelson, began having a love affair, and in May of 1985, she left her husband and children to move with Nelson to Coffee County, Alabama.
Both Michael Wayne Railey and Joseph Michael Downs were approached by appellant Mullis with a request that they assist him in killing Nelson, but both men refused. The appellant finally approached David Stubbs, who accepted his offer to murder James Edward Nelson. Mullis, David Stubbs, and Stubbs's uncle, Richard Adams, then conspired to kill Nelson. Appellant *Page 207 
Mullis was to pay Stubbs and Adams $10,000 upon completion of the crime. Stubbs and Adams, according to the plan laid out by Mullis, were to break into Nelson's home, rob him, and then abduct him. Mrs. Mullis was to be tied up in order to prevent her from escaping. Stubbs and Adams were then to use one of Nelson's automobiles, take him to the Conecuh River, kill him, and dispose of the body.
On July 24, 1985, the appellant, Stubbs, and Adams left Georgia at approximately 5:00 p.m. and arrived in Troy a few hours later. While in Troy, they stole a blue pickup truck from an apartment complex and drove just outside of Troy. The appellant told Stubbs and Adams that they were to meet him at the Omelet Shoppe restaurant in Troy after the murder. Stubbs and Adams then drove to the Nelson's home, disconnected his telephone line, and parked the stolen truck on an isolated logging road near the home. They walked back to the house wearing ski masks and gloves. They entered the house through an unlocked rear door and burst through the door of the bedroom where Nelson and Mrs. Mullis were sleeping. Stubbs was carrying a .38 caliber pistol and Adams was armed with a .32 caliber pistol. Both pistols belonged to Mullis. Mullis had traded Larry Bullock a shotgun for the two pistols. Bullock subsequently testified to the exchange in this trial. Stubbs ordered Nelson to bind Mrs. Mullis with tape, and he did so. Also, Stubbs demanded that Nelson hand over his wallet. He again complied. Mrs. Mullis's money was also taken. Stubbs then demanded the keys to Nelson's automobile, and they proceeded to march Nelson at gunpoint to his car. Nelson was placed in the back seat of his car, with Adams seated next to him. Stubbs drove the car to a bridge located about five miles from Nelson's home. Stubbs led Nelson to the bridge, and, while Adams acted as a lookout, shot him in the head with the .38 pistol. Stubbs and Adams lifted Nelson's body and threw it over the bridge, where it landed on the river bank next to the Conecuh River. Stubbs and Adams then returned to Nelson's car and drove back to Troy to meet Mullis at the Omelet Shoppe. They saw Mullis' car parked at the end of the Omelet Shoppe's parking lot, but parked the car beside the Discount Tire and Muffler Center, located about 50 yards from the Omelet Shoppe. After wiping the car clean of prints, they walked back to the Omelet Shoppe, where they met Mullis. The two then got in Mullis's car and left Troy to return to Georgia. On their return trip, they divided the money stolen, approximately $800, and Mullis received $200 of the money taken during the crime. As they crossed the bridge at Lake Eufaula, Stubbs threw the murder weapon, the .38 pistol, into the water, and attempted to throw Nelson's wallet into the water but it hit a pole and landed on the bridge. This pistol was recovered by law enforcement officials after Adams was arrested. The .32 pistol carried by Adams was not thrown over the bridge into the water because Adams wanted to sell it.
Mrs. Mullis, a short time after 1:00 a.m., freed herself and ran to a neighbor's house, where she called the Coffee County sheriff's office. Several units were summoned to the scene and she recounted the events that had occurred several hours earlier.
The next morning, Nelson's body was discovered lying in the bushes alongside the Conecuh River. Several law enforcement officials arrived at the bridge and found a .22 caliber shell casing, blood, fragments of glass, and a key ring later identified as belonging to Nelson. Later, the pickup truck stolen by Adams and Stubbs was discovered, and the Troy Police Department discovered Nelson's car parked near the tire store in Troy.
Dr. David B. Rydjewski conducted the autopsy on the body of Nelson and, as a result of his examination, determined that Nelson had died as a result of a gunshot wound to the head.
Lonnie Harden, a firearms and tool mark expert with the State of Alabama's Department of Forensic Sciences, testified to the tests run on the .38 pistol that Mullis had obtained for Stubbs to use as the murder weapon. Harden was able to compare one *Page 208 
of the test-fired bullets to that of the bullet recovered from the victim's body. In his opinion, he testified, the bullet could have been fired from that weapon.
Jane Elise Dewberry, a waitress at the Omelet Shoppe in Troy, testified that Mullis entered the restaurant around 8:30 p.m. on the night of the murder and ordered a cup of coffee. She testified that Mullis never ordered any food and was still seated in the restaurant when she completed her shift at 10:00 p.m. Ms. Dewberry, when questioned by the Troy Police Department a week and a half after the murder, had identified Mullis as a customer in the Omelet Shoppe that night. Ms. Dewberry had identified Mullis after being shown six different photographs. She testified that Officer Donald Brown of the Troy Police Department did not suggest that Mullis's photograph was the one of the suspect and that she recognized the photograph of the appellant from memory.
Archie Adams, Mullis's cellmate for three months in the Coffee County Jail, testified that Mullis admitted to him his involvement in the murder. He said Mullis also told him that Stubbs and Adams dropped him off at Leon Frier's house in Columbus, Georgia, on the night of the murder, and that this would be his alibi. Actually, Mullis, Stubbs, and Adams did stay at the home of Mullis's friend Leon Frier, but they did not arrive there until 5:00 a.m. on the morning of July 25, 1985.
Additionally, Archie Adams testified that Mullis gave him a letter that he had written in order to falsely implicate Mrs. Mullis in the killing. Adams said that Mullis wanted him to give it to his wife to have it recopied in her handwriting so that it would appear that it did not come from him. Adams took the letter and gave it to his wife with instructions for her to give the letter to the Coffee County Sheriff's Department. Adams's wife did, in fact, give the letter to the sheriff's office, and it was subsequently introduced into evidence at trial.
Richard Adams and David Stubbs were 17 years old at the time of the murder. Adams pleaded guilty to the lesser offense of murder and testified against Mullis. Adams also testified that the appellant told him that if he testified against him, he would make certain that he would not walk out of prison alive.
 I
Mullis's first contention is that the trial court erred in refusing to grant his motion for a change of venue. He argues that there was extensive pre-trial publicity and that it created an atmosphere of prejudice that prevented him from obtaining a fair trial. Specifically, he contends that his motion should have been granted because four members of the venire indicated during voir dire that they had read or heard news accounts of the murder. However, each of those four veniremen, as well as all other venire members, indicated that they could be impartial and base their decision solely on the evidence presented at the trial. Moreover, the only veniremen struck were those who indicated their opposition to the death penalty or expressed some difficulty in acquitting Mullis if he did not testify in his own behalf.
To establish the existence of prejudice against a defendant sufficient to justify a change of venue, specific facts and circumstances must be established to indicate that it will be practically impossible to obtain an impartial jury to try the case, and such a showing may not be based on speculation.Kennedy v. State, 472 So.2d 1092, 1095 (Ala.Cr.App. 1984),aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975,106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The accused must affirmatively show that pre-trial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual juror prejudice. Langhamv. State, 494 So.2d 910, 913 (Ala.Cr.App. 1986); Grayson v.State, 479 So.2d 69, 74 (Ala.Cr.App. 1984), cert. denied,479 So.2d 76 (Ala. 1985).
The fact that there was widespread publicity is not sufficient to require a change of venue, and a qualified juror need *Page 209 
not be totally ignorant of the facts in the case. Peoples v.State, 510 So.2d 554, 563 (Ala.Cr.App. 1986), aff'd,510 So.2d 574 (Ala.), cert. denied, ___ U.S. ___, 108 S.Ct. 307,98 L.Ed.2d 266 (1987).
The granting of an accused's motion for a change of venue rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed except for gross abuse.Knighten v. State, 507 So.2d 1015, 1021 (Ala.Cr.App. 1986). See also Anderson v. State, 443 So.2d 1364 (Ala.Cr.App. 1983); Lopezv. State, 415 So.2d 1204 (Ala.Cr.App. 1982).
In our opinion, the appellant failed to show that there was gross abuse of discretion on the part of the trial court in failing to grant his motion for a change of venue. We decide this issue adversely to appellant.
 II
The appellant's second contention is that the trial court erred in allowing the in-court identification by witness, Jane Dewberry, because, he says, it was based upon an unduly suggestive out-of-court photographic lineup. He further asserts that the trial court compounded this error by failing to allow the appellant to be seated somewhere in the courtroom other than by his defense counsel in order to test her identification of him.
Jane Dewberry (the Omelet Shoppe waitress), on August 3, 1985, a few days after the homicide, was shown six photographs by investigators. Mullis contends that the photographic lineup was unduly suggestive because only one other photograph resembled him.
A hearing was held outside the presence of the jury in order to determine the admissibility of her identification of the appellant. Dewberry testified that she was shown six photographs and that the appellant's photograph was not suggestive to her in any manner, and that she picked Mullis's photograph as that of the person she had seen on July 24 at the Omelet Shoppe. She stated that her identification was not based upon any suggestion given her regarding the photograph, but upon her memory of the event of July 24, 1985. She was asked to view the courtroom and to identify the man she saw on the night of the murder, and she identified Mullis. In the presence of the jury, she elaborated on the reasons that her attention had been drawn to Mullis on that evening at the Omelet Shoppe. She said he was seated in a booth facing the parking lot and Highway 231; that he ordered only coffee, held his head down, and would not speak; and that he came into the Omelet Shoppe around 8:30 p.m. and was still there when she got off her shift at 10:00 p.m. She said that the manager approached him after he had been seated for 45 minutes and inquired as to why he had not ordered any food. She said that she remembered him because she reasoned that she would receive less money in tips because he had only coffee.
The trial court found that Ms. Dewberry's identification of the appellant at trial was of independent origin and was not tainted by having seen and remembered any photograph. Certainly the witness had a long time to view Mullis and therefore to form a basis for remembering him.
Reliability is the linchpin in determining the admissibility of identification testimony. Walker v. State, 523 So.2d 528,533 (Ala.Cr.App. 1988); see also Manson v. Braithwaite,432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).
The record reflects that the complained of out-of-court identification was not unnecessarily or impermissibly suggestive. Therefore, the pre-trial photographic lineup did not give rise to a substantial likelihood of irreparable misidentification. Moreover, Ms. Dewberry's in-court identification of the appellant appears to have been based solely on her recollection of July 24, 1985, and not upon having seen the photographic line-up.
When an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence. Clements v. State,521 So.2d 1378, 1382 (Ala.Cr.App. 1988); Coleman v. State,487 So.2d 1380, 1388 (Ala.Cr.App. 1986). *Page 210 
The sole witness's in-court identification was correctly received into evidence, as it was based on a source independent of the lineup.
Additionally, the appellant contends that the trial court committed reversible error when it refused to allow him to sit among the spectators in the courtroom. In Dent v. State,423 So.2d 327, 328 (Ala.Cr.App. 1982), we held that the trial judge, as a matter within his discretion, correctly denied the defendant's motion to sit among the spectators in the courtroom because a defendant has no right to an in-court lineup. No error was committed in this respect.
 III
The appellant's third contention is that the trial court erred in denying his motion for acquittal at the end of the State's case. Specifically, he contends that his motion should have been granted because, he argues, the State failed to sufficiently corroborate the testimony of his co-defendant, Richard Adams. We disagree.
In Pickett v. State, 489 So.2d 673, 674 (Ala.Cr.App. 1986), we held:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corrobarative evidence, if it merely shows the commission of the offense or circumstances thereof, is not sufficient."
Section 12-21-222, Code of Alabama 1975.
 "The formula applied to the corroboration statute, Ala. Code § 12-21-222 (1975), requires that the evidence of the accomplice must first be 'eliminated' and then, if upon review of all other evidence before the trial court at the time of the motion to exclude, there is found to be sufficient incriminating evidence which would tend to connect the accused with the crime, sufficient corroboration exists."
Evidence must do more than raise a suspicion of guilt and must be inconsistent with the innocence of the accused, in order to adequately corroborate accomplice testimony. However, the evidence need not be strong or sufficient of itself to support a conviction; rather it must tend to connect the accused with the offense. Harris v. State, 420 So.2d 812, 817
(Ala.Cr.App. 1982). It is not necessary that such evidence be direct and conclusive; circumstantial evidence from which the guilt of the defendant can be reasonably inferred is sufficient. Beavers v. State, 497 So.2d 612, 614
(Ala.Cr.App. 1986); McConnell v. State, 429 So.2d 662, 666
(Ala.Cr.App. 1983). Andrews v. State, 370 So.2d 320, 322
(Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979). In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Also, indications of consciousness of guilt may be considered as corroborative evidence. Pickett, supra, at 675.
In the case at bar, after the elimination of the testimony of the accomplice, Richard Adams, the remaining evidence tends to connect the appellant with the crime. Other evidence was presented to show that Mullis attempted to hire two other men, Michael Railey and Joseph Downs, to kill Nelson. Larry Bullock testified that the appellant traded his shotgun for his .32 and .38 pistols. These pistols were seen by Mrs. Mullis in the hands of Stubbs and Adams at the scene of the crime. Also, Mrs. Mullis testified that she had seen Adams and Stubbs with the appellant several days before the murder. Jane Dewberry testified that the appellant was at the Omelet Shoppe in Troy on the night of the murder. Archie Adams, the appellant's cellmate in the Coffee County Jail, testified that the appellant admitted plotting to kill the victim and that his accomplices were to be paid $10,000 for their part in the crime.
This evidence powerfully connects the appellant with the commission of the offense. The evidence presented corroborated the testimony of Richard Adams. Therefore, no error was committed in denying *Page 211 
the motion for judgment of acquittal on this ground.
 IV
The appellant's fourth contention is that the trial court committed reversible error in failing to charge the jury on the lesser included offense of conspiracy to murder. We disagree. The homicide was committed.
The jury, from the evidence presented, could arrive at only one or two conclusions. The appellant was either guilty of the capital offense as charged or was not guilty. The appellant essentially presented an alibi defense. The appellant, when testifying in his own behalf, denied any involvement in the crime. The jury had the option of believing the State's witnesses or believing the appellant's version and acquitting him.
In Cook v. State, 431 So.2d 1322, 1325 (Ala. 1983), our Supreme Court held:
 "A plea of not guilty merely says that the defendant claims he is not guilty of the crime charged. It does not preclude the jury from considering evidence which tends to show that the defendant may be guilty of some other, lesser included crime. But when a defendant takes the witness stand and testifies that, because he was in a distant location when the crime took place, he could not possibly have committed it, he has directly contradicted any evidence which he might later produce to show that he was guilty of a lesser included offense."
A court may refuse to charge on a lesser included offense "when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser included offense." Chavers v. State, 361 So.2d 1106,1107 (Ala. 1978); Greer v. State, 475 So.2d 885, 890
(Ala.Cr.App. 1985); Wesley v. State, 424 So.2d 648
(Ala.Cr.App. 1982).
In McKeithen v. State, 480 So.2d 36, 37 (Ala.Cr.App. 1985), we held:
 "[W]here the accused denies committing any offense, if any reasonable interpretation of the evidence will justify a verdict finding the accused guilty of a lesser included offense, the jury must be so instructed. Ex parte Stork, 475 So.2d 623 (Ala. 1985). A judge may properly refuse to charge on lesser included offenses only where the only reasonable conclusion from the evidence is that the accused is guilty of the offense charged or no crime at all or where the requested charge would have a tendency to mislead or confuse the jury."
In Gurganus v. State, 520 So.2d 170 (Ala.Cr.App. 1987), the defense was one of alibi and the State did not present any reasonable theory to support a charge on a lesser included offense. We held that if the jury believed the appellant, he must have been found not guilty; if they believed the prosecution's evidence, he must have been found guilty of the crime charged.
Recently, in Moton v. State, 524 So.2d 381, 383
(Ala.Cr.App. 1988), we held that a trial court correctly refused to charge on a lesser included offense where the only reasonable conclusion from the evidence was that the accused was either guilty of the offense charged or of no crime at all.
Therefore, the court did not err in refusing to charge on the lesser included offense of conspiracy to murder.
 V
The appellant's final contention is that the trial court erred to reversal in allowing the indictment to go to the jury in three counts rather than requiring the State to elect which count to submit to the jury. Specifically, he claims that he was unduly prejudiced by the trial court's failing to require an election.
The three counts submitted to the jury were: murder for hire, murder during a kidnapping, and murder during a robbery. However, the record shows that no attempt was made to convict the appellant of two or more offenses arising from the murder. The trial court's oral charge states:
 "Ladies and gentlemen, these verdicts are in my handwriting to save you from trying to remember how to execute them, so to speak. *Page 212 
 "If you have been convinced beyond a reasonable doubt that this Defendant was the person accountable for the behavior of another in the commission of murder done for pecuniary consideration or contract for hire, this is the form of the verdict. We, the jury, find the Defendant Easton Darris Mullis, Jr., guilty of murder done for a pecuniary or other valuable consideration pursuant to a contract of for [sic] hire as charged in count one of the indictment.
 "If this be your verdict that the Defendant, that you have been proven to your satisfaction beyond a reasonable doubt that the Defendant was accountable for the behavior of another who did commit the absolute act of murder during a robbery, this is the form of the verdict. We, the jury, find Defendant Easton Darris Mullis, Jr., guilty of murder during a robbery in the first degree as charged in count two of the indictment.
 "If your verdict be that Defendant Mullis is accountable for the behavior of another who did commit the absolute act of murder during a kidnapping in the first degree this verdict [sic]. We, the Jury, find Defendant Easton Darris Mullis, Jr., guilty of murder during the kidnapping in the first degree as charged in count four of the indictment.
 "Again, the burden of proof is on the State to prove your guilt — prove his guilt, beyond a reasonable doubt, and if that hasn't been established to your satisfaction as explained to you; We, the Jury, find the Defendant Easton Darris Mullis, Jr., not guilty of the capital offense of murder.
 "We trust that you understand that was [sic] allegation, each count is separate and distinct, independent, and has to be stood up and prove [sic] on its own bottom. They are allegations under different sections in the law and they are not dependent upon the other, and only one verdict can be returned. I wrote these verdicts in such a fashion mentioning count four spelling out what the aggravation was, and count two and spelling out [sic] the aggravation was, and count one setting out [sic] the aggravation was to convey to you that they are independent allegations. He can be found guilty, if found guilty, of only one murder with aggravation, and that is why three separate verdicts specifying which one, if any, that your decision results [sic]. But if you don't believe the evidence beyond a reasonable doubt of guilt of any element of aggravation or complicity or accountable [sic] for the behavior of another, then, again, 'We the jury, find the Defendant Easton Darris Mullis, Jr., not guilty of the capital offense of murder.' "
Thus, it appears that the trial court instructed the jury that they could find the appellant guilty of only one of three counts of capital murder. This was incorrect. However, as this instruction was in no way prejudicial to the appellant, it constituted harmless error. Rule 45B, A.R.App.P.
Moreover, the appellant's contention that the trial court erred in failing to require an election is also incorrect. This court, in Jackson v. State, 516 So.2d 726, 763
(Ala.Cr.App. 1985), remanded, 516 So.2d 768 (Ala. 1986), made it clear that a defendant may be "properly indicted and convicted for two separate and distinct capital offenses 'notwithstanding a substantial overlap in the proof offered to establish the crimes.' Iannelli v. United States, 420 U.S. 770, 785, n. 17,95 S.Ct. 1284, 1293, n. 17, 43 L.Ed.2d 616 (1975)." Therefore, no reversible error occurred here.
The judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur. *Page 213