TAYLOR, Presiding Judge.
The appellant, Nicholas Cheriogotis, was charged with the murder of Lamar Smith, a violation of § 13A-6-2, Code of Alabama 1975. He was convicted of the lesser included offense of manslaughter and was sentenced to 15 years’ imprisonment.
The evidence tended to show that on November 17, 1987, Lamar Smith was shot and killed in Grimes, Alabama. Evidence revealed that on the afternoon of November 17, 1987, an Emery delivery service truck, driven by the deceased, Lamar Smith, was seen “going in and out of traffic,” and a small brown pick-up truck driven by the appellant Nicholas Cheriogotis, was behind it. Appellant’s small child was with him in the pick-up truck. Dwight McMillan, a state’s witness, testified that he saw the driver of the Emery truck looking in his rear-view mirror, pointing and laughing. Lamar Smith had, in the past, been employed by the appellant.
Norma Skipper testified that later that same afternoon she heard a “commotion” outside of her home and went to see what had happened. She saw an Emery truck in her driveway and a brown pick-up truck behind the Emery truck. Ms. Skipper also saw a body in the grass about 90-100 feet from the Emery truck. Ms. Skipper observed a man, whom she identified as the appellant, behind the wheel of the brown pick-up truck. As she approached the pickup truck, her son also joined her, and the appellant got out of his vehicle. Ms. Skip *1149 per asked the appellant what had happened. She testified that appellant stated: “I had to shoot him. I had to shoot him. The man’s crazy. He tried to cut me with a knife.” The appellant also told them that he had called the police. The appellant showed them a cut on his arm. Mike Skipper, Ms. Skipper’s son, testified as to the same chain of events; however, Mike heard the gunshots.
A statement made by the appellant, which was received into evidence, stated that the deceased had been following him around town harassing him and “shooting him birds.” The appellant said that he got tired of this, pulled over, and approached the deceased and that when he approached Smith, Smith tried to cut his throat. At that time, the appellant stated, he went back to his truck and got his gun. He turned on Smith and started firing. He said that he initially fled the scene but returned after calling the police. On appeal, appellant raises three issues.
I
Initially, appellant contends that the trial court erred in giving state’s requested charge number 1. This charge read:
“I instruct you that the law presumes that every adult person intends to do that which he does and that the natural and necessary, and probable consequences of a person’s acts are intended. When one kills another by the intentional use of a deadly weapon, the law gives rise to a presumption of malice, design, and motive, unless other evidence rebuts the presumption.” (Emphasis supplied.)
Appellant argues that the first part of this instruction shifted the burden of proof from the prosecution to the appellant and thereby violated his right to due process of law under the United States Constitution. This is an issue on which the United States Supreme Court has very clearly spelled out its interpretation of the law.
The United States Supreme Court in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), addressed this issue. In that case the charge read as follows: “[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.” The Supreme Court began its analysis by determining “the nature of the presumption.” Would a reasonable juror view the instruction as disallowing all alternatives? In Sandstrom, the jury was not told that the presumption could be rebutted. Thus, the Court held that “a reasonable jury could well have interpreted the presumption as ‘conclusive,’ that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption.” Sandstrom, 442 U.S. at 517, 99 S.Ct. at 2456.
The Court in Sandstrom did not reach' the issue of harmless error. However, in 1983, the United States Supreme Court addressed the harmless error question in Connecticut v. Johnson, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). Could a charge that required a conclusive presumption ever be harmless? The questioned jury instruction in Johnson stated that intent is “a question of fact that is solely within your province as jurors,” and further:
“However, you should be aware of a rule of law that will be helpful to you and that is that a person’s intention may be inferred from his conduct and every person is conclusively presumed to intend the natural and necessary consequences of his act.” Johnson, 460 U.S. at 78, 103 S.Ct. at 973.
The instances are rare where the appellate court can say that such an instruction did not affect the jury’s verdict. Such an instance might be where the appellant concedes the element of intent or where the instruction was given and the appellant was acquitted. Additional instances might be cases in which the issues of insanity, self-defense, and alibi have been raised and the appellant admits that the act was intentional. Perhaps the jury’s verdict might be unaffected by a Sandstrom charge. See, Johnson, supra. The court in Johnson held that the conclusive presumption “deprived respondent of ‘constitutional rights so basic to a fair trial that their infraction *1150 can never be treated as harmless error.’ ” Johnson, 460 U.S. at 88, 103 S.Ct. at 978.
In Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the United States Supreme Court again considered a similar instruction. However, in Francis, the jury was informed that the presumption could be rebutted. The court considered the jury instructions as a whole. Immediately prior to the Sandstrom instruction, the trial court stated: “A person will not be presumed to act with criminal intention. . . .” Francis, 471 U.S. at 319, 105 S.Ct. at 1974. Reaffirming the Court of Appeals, the Supreme Court stated that the Sandstrom error at trial could not be deemed “harmless.” Francis, 471 U.S. at 325, 105 S.Ct. at 1977.
Recently, in the case of Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the Supreme Court once again addressed a variation of the Sandstrom issue and the question of whether to apply the harmless error standard. The trial court charged the jury:
“All homicides are presumed to be ma•licious in the absence of evidence which would rebut the implied presumption. Thus, if the State has proven beyond a reasonable ... doubt that a killing has occurred, then it is presumed that the killing was done maliciously. But this presumption may be rebutted by either direct or circumstantial evidence, or by both, regardless of whether the same be offered by the defendant, or exists in the evidence of the State.”
478 U.S. at 574, 106 S.Ct. at 3104.
“Rose requires an examination of the record as a whole to determine whether the evidence of intent is so dispositive that the ‘reviewing court can say beyond a reasonable doubt that the jury would have found it necessary to rely on the presumption.’ ” Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988).
This court ruled recently in Freeman that a like charge was harmless where there was overwhelming evidence of the appellant’s guilt and of his intent. In Hall v. State, 49 Ala.App. 381, 272 So.2d 590 (Ala.Cr.App.1973), Hall was charged with the malicious murder of his cellmate; however, the jury convicted him of manslaughter. The instruction to the jury was that “the law says that a person is presumed to intend to do that which he does.” Hall at 383, 272 So.2d 590. This court stated:
“The jury may mistakenly believe that it is permissible to infer specific knowledge or intent solely from the doing of a particular act, without regard to the totality of circumstances; or that the occurrence of the particular acts shifts the burden of proof of knowledge or intent from the prosecution to the defense; or that the question is whether a reasonable man in similar circumstances would have had the requisite knowledge or intent, rather than whether the accused actually had it.” Hall at 385, 272 So.2d 590.
This court reversed appellant’s conviction, holding that the trial court committed error by giving the above charge to the jury.
Applying the United States Supreme Court’s reasoning, as we must, the jury in the instant case was given a charge that created a “conclusive presumption.” The jury was never instructed that the presumption was rebuttable. Furthermore, the appellant never conceded or admitted any intent to kill the deceased. No other statements in the jury charge countered the effect of that instruction. Thus, the trial court erred to reversal in using a Sandstrom charge in its jury instruction.
Although we are not required to address the remaining issues, in the interest of judicial economy we choose to do so.
II
Appellant Cheriogotis contends that the trial court erred in receiving into evidence a written statement made by Lieutenant Jones, setting out what Cheriogotis had said to him. Specifically, appellant argues that the statement was not shown to him or ratified by him and that no predicate with reference to recollection or lack thereof was laid.
The record reflects that the appellant made a statement to Lieutenant Jones and Captain McLeod after he was first brought *1151 to the police station. The interview was taped, and the tape was subsequently played to the jury. Lieutenant Jones testified that after the tape recorder had been turned off, the appellant made another statement which Lieutenant Jones wrote down and initialed, along with Captain McLeod. Jones testified that the appellant stated, “I’m a good shot with a gun, and I don’t understand why I didn’t hit him with the first shot.” On cross-examination of Lieutenant Jones, appellant’s counsel asked the following question. “Let me ask you about this statement. You said that he said, ‘I don’t know why I didn’t hit him on the first shot.’ Isn’t really what he said, ‘I’m a good shot. If I had wanted to hit him I would have hit him right away?’ ” Jones answered that that was not the statement appellant made to him and McLeod.
When the appellant testified, he denied making the statement. He testified that “[tjhey asked me was I trying to hit him and I said, ‘No, if I was trying to hit him, I’m a good shot and I would have hit him with the first shot.’ ”
Captain McLeod was called as a rebuttal witness, and he contradicted Cheriogotis. The state then offered the written statement into evidence, over objection.
It is clear that the statement was not offered for the purpose of showing past recollection recorded or present recollection revived. The state was trying to rebut a statement made by the appellant. “As a general rule, inconsistent or contradictory statements of a witness offered to impeach his testimony may be proved by other witnesses.” 98 C.J.S. Witnesses § 613 (1972). “It has also been held that the impeaching witness may be asked either whether the particular words claimed were used, or to state what words were used.” 98 C.J.S. Witnesses § 617 (1972). Appellant argues that the statement was introduced to bolster the credibility of the witness. In Varner v. State, 497 So.2d 1135 (Ala.Cr.App.1986), this court held that a video tape offered'as rebuttal evidence was admissible since it was offered as evidence of a prior inconsistent statement. In this case, the statement was offered as proof of a prior inconsistent statement.
Appellant further argues that no cautionary instructions were offered since “prior inconsistent statements of a witness may be used to impeach the credibility of the witness but, generally, may not be considered as substantive evidence.” Varner at 1137. Counsel failed to request any cautionary instructions, and the trial court is not required ex mero motu to give the jury limiting instructions. See Varner, supra. Thus, no error occurred in this instance.
Ill
Last, appellant contends that the trial court erred in allowing the testimony of a conversation between the victim and a third person to come into evidence. Specifically, appellant argues that the conversation is inadmissible since it took place outside the presence of the defendant, was not a dying declaration, and was not part of the res gestae.
Michael Howell, a friend of the victim, Lamar Smith, testified to certain conversations he had with Smith concerning appellant Cheriogotis. Howell had worked for the appellant and so had Smith. Howell testified to a conversation he had with Smith the day Smith was fired. He stated:
“I pulled over to see what he was doing there and he said that Nick wasn’t gonna punch him around and that he was just not going to back down from him. He was gonna let him know he wasn’t scared of ’em. And I told Lamar that he had better leave him alone. Just let it drop.”
Howell further testified to a conversation he had with Smith after Smith picked up his last check. Howell testified:
“He said, ‘Come here and look at what this crazy fool did.’ He had a kind of a smile on his face just like something else had happened. I went over there and looked at his car door or his truck door and the window facing was bent from the roof of the truck about this far (indicating) and he said that Nick had slammed the door on him and that he *1152 was fixing to go put out a warrant for Nick.”
Appellant cites the case of Hargrove v. State, 368 So.2d 335 (Ala.Cr.App.1979), in support of his contention that the foregoing statements were wrongfully received into evidence. “Statements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence or unless they are admitted in evidence as part of the res gestae or constitute dying declarations.” Hargrove at 337.
Statements made by the victim concerning his relationship with the appellant were very clearly relevant in this murder case, where self-defense was an issue. Cheriog-otis himself testified to prior altercations he had had with Smith. The events leading up to the death of Smith were related to the reason for the final altercation which resulted in the death of Lamar Smith. Thus, they were part of the res gestae, which “embraces all facts which are relevant, explanatory, or illustrative of, or which give character to, or illustrate the character of, or which characterize the act or principle fact which was the subject of or for the decision.” Smith v. State, 447 So.2d 1327, 1329-30 (Ala.Cr.App.1983), aff’d, 447 So.2d 1334 (Ala.1984).
Also, “[a]ny fact which tends to prove the real motive of the defendant for killing the deceased is relevant evidence.” Voudrie v. State, 387 So.2d 248, 252 (Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala.1980). See also, Walker v. State, 523 So.2d 528, 532 (Ala.Cr.App.1988).
For the reasons set out in part I above, this case is reversed and remanded for a new trial.
REVERSED AND REMANDED.
TYSON and PATTERSON, JJ., concur.
BOWEN, J., concurs with opinion.
McMILLAN, J., joins in concurrence.