[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1036 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1037 
The appellant, Mark Allen Jenkins, was convicted of murder made capital because it was committed during the course of a robbery and a kidnapping. See §§ 13A-5-40(a)(2) and13A-5-40(a)(1), Code of Alabama 1975. The jury, voting 10 to 2, recommended death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The appellant raises numerous issues both in his original brief and in his reply brief. However, some of the issues raised by the appellant on appeal were not preserved because no objection was made at trial. In any case involving the death penalty, this failure to object operates as a bar to our review, unless the error rises to a level referred to as "plain error." See Luther Williams v. State, 601 So.2d 1062
(Ala.Cr.App. 1991); Arthur v. State, 575 So.2d 1165
(Ala.Cr.App. 1990), writ denied, 575 So.2d 1191 (Ala. 1991). Rule 45A, A.R.App.P., states, "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant." "[T]he plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " United Statesv. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1
(1985), quoting United States v. Frady, 456 U.S. 152, 163,102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).
 I
The appellant initially contends that there was insufficient evidence to find him guilty of murder during the course of a robbery and kidnapping.
The state's evidence tended to show that in the late afternoon of April 21, 1989, the nude body of an unidentified female was found on an embankment on the side of interstate highway 59 south near Pelham, Alabama. The body was badly decomposed and was later identified by dental records as Tammy Hogeland. The cause of death was manual strangulation. The victim's hyoidal bone was fractured which is consistent with a manual strangulation as opposed to other types of strangulation.
Several items of clothing were recovered from the scene: a ladies watch, a blue apron, a pair of ladies white tennis shoes, a brassiere, a pair of black slacks, and a hair net. Other items found at the scene were an owner's manual for a Mazda RX7 automobile, a fraternity card, photographs, a cable TV guide, a road map, a work order for repair on a Mazda automobile, and several beer and soft drink cans.
Tammy Hogeland was last seen in the early morning hours of April 18, 1989, at the *Page 1038 
Airport Omelet Shoppe restaurant in Birmingham where she was working. She was scheduled to work that evening at the Riverchase Omelet Shoppe, but when an employee did not come to work at the Airport Omelet Shoppe, she was asked to work there. Her sister, Wendy Hogeland, and her sister's boyfriend drove the appellant to the Airport Omelet Shoppe at around 10:00 p.m. on the evening of April 17. Wendy Hogeland testified at trial that Tammy at that time had on her jewelry, which included a Citizens brand watch, a necklace with the words "special sister," a class ring with a topaz stone, and a diamond cluster engagement ring. That evening the victim was working as a cook, and she was wearing a blue apron, black pants, a white shirt, and a pair of white shoes. Early in the morning of April 18, the victim and Sarah Harris were the only employees working at the Airport Omelet Shoppe. At about 2:00 a.m. Sarah Harris observed a red sports car[1] being driven into the parking lot. She stated that she remembered the car because it almost jumped the curb and came through the glass wall of the restaurant. Harris identified the appellant, Mark Allen Jenkins, as the individual driving the car and stated that he appeared to be intoxicated when he came to the Omelet Shoppe. The appellant walked over to the victim and began talking to her. Harris saw the victim and the appellant drive off in the red sports car. She could not testify at trial whether the victim went willingly or was abducted. Testimony did reveal that the victim was a heavy smoker and that she left behind her cigarettes, her lighter, her purse, and her paycheck, which had been issued that evening. Harris had also worked with the victim on several occasions and said that she had never before left the shop without telling anyone as she did that evening.
Later, at around 5:00 a.m. on the morning of April 18, Geraldine and Bobby Coe were at a Chevron gasoline service station on I-59, when they saw an individual in a red sports car. They identified the individual in the car as appellant Jenkins. They also stated that a female was in the front passenger seat of the car and that she appeared to be "passed out." They could not say whether she was alive or dead. While Bobby Coe was pumping gas, the appellant approached him and asked him for some cigarettes. Coe gave the appellant some cigarettes, and the appellant said, "looks like it's been a long night and it looks like it's going to be a long day." The appellant then told Coe, "God bless you," and as he was walking back to the red sports car he asked Coe how to get to interstate highway 459. Coe gave him directions. They both got into their respective vehicles and left the station. The Coes, each driving a different car, drove out of the gas station. Bobby Coe stated that he saw the car driven by the appellant follow him for awhile, flash his lights, slow down, and then pull to the side of the road between mile markers 151 and 152. This is the area where Tammy Hogeland's body was found approximately three days later.
By agreement, a statement made by Christine Nicholas was received into evidence. Nicholas told police that she had known the appellant for several months and that she had met him at the Omelet Shoppe where she worked. She further stated that the appellant was at her home on the evening of April 17 and that he stayed at her home until approximately 2:00 a.m. on the morning of April 18. She stated that the appellant was very intoxicated and that he was attempting to seduce her. She resisted and the appellant got "real mad" and asked her several times what she would do if someone came up from behind her and grabbed her. At approximately 1:00 a.m., the appellant and Nicholas went to the Riverchase Omelet Shoppe. The appellant went inside the Omelet Shoppe and talked with one of the waitresses. Shortly after this, the appellant and Nicholas returned to her home, and the appellant fell asleep on the couch. Around 2:00 a.m. the appellant was asked to leave by Ms. Nicholas's mother. When he left, he fell down some steps and then rammed his car into another vehicle. Nicholas also stated that she saw the appellant later in the morning of April 18 at a Delchamps grocery store. The appellant was making a telephone call, looking at a newspaper, and attempting to *Page 1039 
sell his automobile, an old model Buick Century. At this time Nicholas loaned the appellant $4.00 so that he could get some gasoline for his car.
Douglas Thrash, a manager of the Riverchase Omelet Shoppe, saw the appellant at around 1:00 a.m. on the morning of April 18 at the Riverchase Omelet Shoppe. Thrash said that he recognized the appellant because he was a regular customer at the restaurant. The appellant spoke with Frieda Vines, one of the waitresses. Thrash heard mention of, at one point in the conversation, the Omelet Shoppe near the airport. Thrash also stated that the appellant knew all of the waitresses, including the victim, because he was a regular customer and that he talked with them all when he was in the restaurant.
Testimony also established that the appellant sold his car around 10:00 a.m. on the morning of the April 18, to Michael Brooks, a mechanic at the Alford Avenue Chevron gasoline service station in Birmingham. He told Brooks that his mother was sick and that he needed money to go home to California. One of the attendants at the service station took the appellant to the bus station between 11:30 and 12:00 p.m. that day. A ticket agent for Greyhound bus lines testified that she sold two tickets that day between 12:00 and 2:00 p.m. The two destinations were Houston, Texas, and Tulsa, Oklahoma.
When the appellant was living in Birmingham, he was sharing a house with Mitchell Babb. The house was a one-bedroom bungalow with no electricity. Evidence established that the appellant was in financial trouble. The house was owned by John Angwin. Angwin testified that the appellant lived in the house for approximately two months, that he paid no rent, and that he allowed the appellant to stay there so that the appellant could keep his job at a landscape company.
The evidence presented further established that near the appellant's residence in Birmingham was a gasoline service station, Rocky Ridey Road Service Station, where the appellant did some odd jobs. This station was managed by Leon Wooten. About 10 days before the homicide, a red Mazda RX7 automobile was brought into the service station for routine maintenance work. While the car was at the service station, the appellant was working there. Approximately two days before the homicide, the appellant was at the station more frequently, and he parked his Buick automobile there. He told the manager of the station that he wanted to leave his car there because he did not want the person who sold him the car, John Angwin, to know when he was driving the car. On April 18, one of the managers of the Rocky Ridey Road Service Station noticed that the ignition to the service truck had been tampered with. When the manager discovered this, the appellant was at the station putting some gasoline in his Buick. The manager asked the appellant if he knew anything about the service truck and he replied that his Buick had also been tampered with. Later in the day when the owner of the red Mazda came to pick his car up from the station, it was gone. The car was later recovered on I-459 near Leeds. While the Mazda was at the service station, the keys to it were left in the car above the visor. The manager of the station said that they always left car keys above the visors.
Steve Musser testified that he had known the appellant for approximately six months prior to the murder. On the day before the victim disappeared, the appellant approached Musser and asked him if he wanted to buy a chainsaw. At this time the appellant was dressed in jeans and a pullover shirt. After talking for several minutes, the appellant left. On the morning of April 18, the appellant again came to see Musser and was dressed in the same clothes that he had on the day before. The appellant told Musser that someone had stolen his car the night before, and he asked him if he would say that he had been with him all night. Musser refused and the appellant stayed and talked for about 15 minutes and left. Musser did not see the appellant again.
The appellant was identified as a suspect by Michael Weems, a Hoover Police Officer. Weems went to the Omelet Shoppe where the victim worked every day. He knew that the appellant knew the victim and that when the appellant was in the restaurant he would talk with her and that on several occasions he had passed notes to her on napkins. *Page 1040 
The owners of the Mazda identified the car recovered off I-459 as their vehicle. They further identified items found near the victim's body as items that were in the Mazda when they took the car in to the Rocky Ridey Road Service Station for repairs. Several business cards from a golf professional at Delray Beach Municipal Golf Course in Florida were identified as those that were in the glove compartment of the Mazda.
Hair fibers collected from the victim and items of her clothing tended to establish her presence in the red Mazda automobile. Fibers from the seat of the automobile were found on her underclothing. Hair fibers consistent with those from the victim were found on the car seat and on the storage area behind the seats. A pubic hair identified as that of the victim's was found on the passenger floorboard mat. Hair fibers collected from some of the appellant's clothing connected him to the red Mazda. Forty-six car seat fibers were found on the appellant's blue jeans. Fibers from the appellant's blue jeans were also discovered on the victim's apron.
Mitchell Babb, the appellant's roommate in Birmingham, identified boots that were recovered from the appellant's uncle in California as being like boots that the appellant wore. A boot print found at the scene of the crime was identified as being consistent with the heel of the boots recovered from the appellant's uncle.
A prisoner who was a cellmate of the appellant in the St. Clair County jail, testified that the appellant approached him several times while they were in jail and talked about the murder. He said that the appellant feared that he would be transferred to Jefferson County because the victim was married to or was going to marry a Jefferson County deputy sheriff. According to this witness, the appellant was afraid that the people from the service station, the Coes, would identify him and he was also afraid that the police would find his fingerprints on a beer can left at the scene, according to this witness. The witness also said that Jenkins told him that "he had done the crime."
In evaluating the sufficiency of the evidence to convict the appellant, we view the evidence in "the light most favorable to the state," as the jury may have interpreted it. McMillian v.State, 594 So.2d 1253, 1263 (Ala.Cr.App. 1991). Some of the evidence against the appellant was circumstantial. However, circumstantial evidence is not deficient evidence; it "is entitled to the same weight as direct evidence provided it points to the guilt of the accused." Hinton v. State,548 So.2d 547, 558 (Ala.Cr.App. 1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
 "A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. In reviewing a conviction based on circumstantial evidence, '[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypotheses except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.' "
McMillian, 594 So.2d at 1263 (citations omitted). See alsoPotts v. State, 426 So.2d 886 (Ala.Cr.App. 1982), aff'd,426 So.2d 896 (Ala. 1983). This statement of the law refers to cases in which the evidence is entirely circumstantial.
 " 'The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.' "
White v. State, 546 So.2d 1014, 1022-23 (Ala.Cr.App. 1989), quoting Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821
(1969).
The appellant maintains that there was insufficient evidence to find him guilty of robbery. "[T]he present Alabama robbery statutes are broader than common-law robbery and embrace acts which, under former law, would have amounted to attempted robbery or to assault with intent to rob." Luke *Page 1041 v. State, 444 So.2d 393, 395 (Ala.Cr.App. 1983), aff'd,444 So.2d 400 (Ala. 1983), cert. denied, 466 U.S. 993,104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Alabama's current capital offense statute related to robbery states that the murder must occur during the course of a robbery or an attempted robbery. Section13A-5-40(a)(2), Code of Alabama 1975 (emphasis added); Piercev. State, 576 So.2d 236, 247 (Ala.Cr.App. 1990), cert. denied,576 So.2d 258 (Ala. 1991). In this case, there was testimony that the victim habitually wore several items of jewelry. When the body was found, the only item of jewelry recovered was a watch. These facts give rise to an inference that the other items of jewelry were taken by the murderer. There was also the direct evidence that the appellant admitted that "he did the crime." "Taking all the evidence and the manner in which the individual facts connect and mingle, and viewing it in the light most favorable to the prosecution, we find that the evidence excluded every reasonable hypothesis or explanation but that of guilt." Jones v. State, 450 So.2d 165 (Ala.Cr.App. 1983), aff'd, 450 So.2d 171 (Ala.), cert. denied, 469 U.S. 873,105 S.Ct. 232, 83 L.Ed.2d 160 (1984) (citation omitted).
The appellant also argues that there was insufficient evidence to find him guilty of kidnapping. "A person commits the crime of kidnapping in the first degree if he abducts another person with intent to . . . [i]nflict physical injury upon him, or to violate or abuse him sexually." Section13A-6-43(a)(4), Code of Alabama 1975. The appellant maintains that there was no evidence that the victim was abducted. He contends that the same evidence could be viewed as showing that she voluntarily left the restaurant with the appellant. The great weight of the evidence, however, points to the opposite hypothesis.
"Abduct" is defined in § 13A-6-40(2) as "to restrain a person with intent to prevent his liberation by either: a. Secreting or holding him in a place where he is not likely to be found, or b. Using or threatening to use deadly physical force." To reiterate, the state's evidence tended to show that the victim was the only cook on duty at the Omelet Shoppe when the appellant came into the restaurant on the night of the victim's disappearance. She was wearing her apron and her work uniform. She left without taking her purse or her cigarettes, even though she was a heavy smoker. The victim was paid that evening and did not take her paycheck. She told no one where she was going. Her clothing and the articles she left behind tend to show that she did not leave voluntarily. Her body was found in a remote area on the side of I-59. "A reasonable juror may well have believed that she would not have voluntarily accompanied [the appellant] to such an area." Neal v. State, 451 So.2d 743,758 (Miss. 1984), cert. denied, 469 U.S. 1098, 105 S.Ct. 607,83 L.Ed.2d 716 (1984), post-conviction relief granted in part on other grounds, 525 So.2d 1279 (Miss. 1987). Furthermore, the position of the clothing around the victim's head and the fact that she was manually strangled tend to show that she was restrained prior to her death. "The physical condition of the body . . . the conduct and admission of the appellant were sufficient to establish . . . the underlying felony of kidnapping." Mines v. State, 390 So.2d 332, 335 (Fla. 1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308
(1981). See also State v. James, 459 So.2d 1299 (La.App. 1984), writ denied, 463 So.2d 600 (La. 1985). Moreover, even if the victim initially left the restaurant with the appellant voluntarily, the offense of kidnapping is not mitigated. Adamsv. State, 412 So.2d 850, 852 (Fla. 1982), cert. denied,459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982).
A reasonable juror could conclude that the appellant's guilt was established beyond a "reasonable doubt." The evidence overwhelmingly pointed to the guilt of the appellant. The case was correctly submitted to the jury for its determination and there is no reason to disturb its verdict.
 II
The appellant next argues that the state prosecutor exercised his peremptory strikes to eliminate jurors from the jury solely on the basis of race, thereby violating the United States Supreme Court holding in Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, *Page 1042 90 L.Ed.2d 69 (1986). The appellant in this case is white. The ruling of Batson was extended, after the appellant was tried, to permit white defendants standing to complain of the purposeful exclusion of blacks from their jury. Powers v. Ohio,499 U.S. 400, 111 S.Ct 1364, 113 L.Ed.2d 411 (1987).
Defense counsel in a pre-trial motion, which was filed prior to any jury selection, filed a motion entitled "Defendant's Motion to Enjoin the Prosecutor from Utilizing his Peremptory Challenges to Systematically Exclude Minorities from the Jury Panel." When the motion was filed, the court stated that it would consider the motion when it was made at the appropriate time after a jury had been struck. This is the last time in the record the motion was mentioned by anyone. The appellant did file a motion for new trial in which he alleged as one of the grounds that the trial court erred in denying his motion to enjoin the prosecutor. Because no objection was made to the composition of the jury after the jury was selected and before they were sworn, and because this is a case involving the death penalty, we must determine whether the alleged error is "plain error."
There is no evidence in the record that the prosecutor used his strikes in a racially discriminatory manner. There is no indication of the racial composition of the jury, though a jury strike list is contained in the record. Neither do we know whether any minorities in fact served on the jury. The record simply does not support an inference of plain error on the alleged Batson violation. Our Supreme Court in Ex parteWatkins, 509 So.2d 1074 (Ala. 1987), cert. denied,484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), refused to find plain error in a similar situation. It stated:
 "The record as a whole simply does not raise an inference that the state engaged in the practice of purposeful discrimination. Under the plain error rule this Court will 'notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.' . . . The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks)."
509 So.2d at 1076-77. See Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). (stating that there was no evidence in the record to support the contention that the State of Alabama used its peremptory strikes to exclude blacks from the jury). "Under the circumstances of this case, we cannot conclude that a prima facie case of purposeful discrimination has been established."Pierce, 576 So.2d at 242.
 III
The appellant next contends that the trial court erred in allowing a prospective juror to be challenged for cause. Prospective juror C.E. was struck for cause because he stated during voir dire questioning that he could not impose the death penalty under any circumstances. The following occurred during the questioning of prospective juror:
 "The Court: Well, that brings up the question. Would you just not impose the death penalty against the defendant regardless of —
 "Prospective Juror C.E.: I would not. I would say not.
 "The Court: You would not, regardless of what the evidence might be you would not impose the death penalty.
"Prospective Juror C.E.: Right.
". . . .
 "Mr. Scofield (defense counsel): My question is that under that scenario, in other words, what the Court is trying to determine is there any set of facts, any set of facts, no matter how brutal, the most heinous thing, the worst thing that you can think of, is there any set of facts in which if the facts were serious enough you could say, yes, I may not want to do it, but I feel like I could do it under these circumstances? *Page 1043 
 "Prospective Juror C.E.: I probably couldn't do it, because, you know, thou shalt not kill. That's what the Ten Commandments say. You know that could keep me out of Heaven."
It is clear that this prospective juror could not sentence anyone to death and thus was not qualified to serve as a juror in this case in which death or life without parole were the only sentencing alternatives. As we stated in Luther Williams, supra:
 "The 'standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, [852], 83 L.Ed.2d 841 (1985). See also Haney v. State, 603 So.2d 368
(Ala.Cr.App. 1991). In the present case, the answers given by the prospective juror clearly indicate the possibility that [he] would be unable to perform [his] duties as a juror."
601 So.2d at 1069. (Emphasis added.)
The trial court's decision is correct, if that court was " 'left with the definite impression that [the] prospective juror would be unable to faithfully and impartially apply the law.' " Luther Williams, 601 So.2d at 1069, quoting Wainwright v.Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841
(1985). Prospective juror C.E. was correctly struck for cause.
The appellant argues in his reply brief that the trial court erred in not allowing certain other prospective jurors to be struck for cause. No objection was made concerning the failure of the state to strike those jurors for cause. Thus we must determine if plain error exists here. Each juror stated that nothing would interfere with his or her ability to be impartial. Several of the jurors answered that they believed in the death penalty and believed in "an eye for an eye." One juror was a retired drug enforcement agent who had testified for the state in the past. One juror's father was a former sheriff of St. Clair County.
The responses given by the jurors on voir dire do not rise to the level of a statutory strike for cause. See § 12-16-250, Code of Alabama 1975. Therefore, we must determine whether there is an "absolute bias" on the part of these jurors. SeeNettles v. State, 435 So.2d 146 (Ala.Cr.App.), aff'd,435 So.2d 151 (Ala. 1983). Humphrey v. State, 591 So.2d 583 (Ala.Cr.App. 1991). As our Supreme Court stated in Knop v. McCain,561 So.2d 229 (Ala. 1989):
 "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986). This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."
561 So.2d at 232. See also Motes v. State, 356 So.2d 712
(Ala.Cr.App.), cert. denied, 356 So.2d 720 (Ala. 1978). "The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render." Pierce, 576 So.2d at 244. The jurors all stated that they could follow the court's instructions and listen to the evidence. The trial court committed no error in not excusing these jurors for cause.
 IV
The appellant next argues that the trial court erred in failing to suppress items "seized" from the appellant's uncle in California. He maintains that the evidence was "seized" from the appellant's uncle without the appellant's consent. The appellant's allegation *Page 1044 
is unsupported by the record. The record reflects that several days after the appellant was arrested in his uncle's front yard, his uncle, Robert Sheedy, called the F.B.I. and told them that he had some of the appellant's personal affects. Agent Carlton Bloom of the F.B.I. went to Sheedy's home and was given a canvas bag containing clothing, a plastic bag containing a pair of boots, and a rust-colored bag containing miscellaneous papers. Sheedy signed a receipt for these items, in Agent Bloom's presence. After Bloom received the items he wrapped them up and forwarded them by certified mail to the Alabama Bureau of Investigation in Birmingham. The items were not seized from the uncle but were voluntarily turned over to law enforcement officers. No search and seizure occurred.
The appellant also argues that the trial court erred in allowing the appellant's roommate, Mitchell Babb, to identify some of the clothing items received from the appellant's uncle. The record shows that Sheedy was subpoenaed and was sent a ticket to come to Alabama to testify and was expected to testify until several days prior to the trial. When the prosecution found out that Sheedy was not going to honor the subpoena, Babb was put on the stand to identify the clothing. A sufficient predicate was established for his testimony. He lived with the appellant for several months and could identify some of the clothing and the boots as those similar to what the appellant had worn. Indeed, Babb identified some of the clothing as one time belonging to him. No error occurred here.
The appellant also maintains that the items of clothing were not relevant and should not have been received into evidence. The clothing and boots tended to connect the appellant to the crime. A boot print was discovered near the body. The print was similar to the heel of a boot that was recovered from the appellant's uncle. Other items of clothing were identified as similar to those the appellant wore on the day of the victim's disappearance. "The test of relevancy sanctioned by the appellate courts of Alabama has been described as follows: 'Under this liberal test, a fact is admissible if it has any probative value, however slight, upon a matter in the case.' "Jennings v. State, 513 So.2d 91, 95 (Ala.Cr.App. 1987), citing C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d ed. 1977).
 "Before evidence may be considered by a jury, it must fulfill certain minimum requirements of admissibility, including that of relevancy. 'Evidence which is relevant has some tendency to make the existence of any fact or inference that is of consequence to the determination of the action more or less probable than it would be without the evidence.' Dawkins v. State, 455 So.2d 220, 221 (Ala.Cr.App. 1984). 'The determination of the relevancy of a particular item of evidence is left to the sound discretion of the trial judge and this court will not reverse unless that discretion has been grossly abused.' Wicker v. State, 433 So.2d 1190, 1198 (Ala.Cr.App. 1983)."
513 So.2d at 97. See also Chisler v. State, 553 So.2d 654
(Ala.Cr.App. 1989), cert. denied, 495 U.S. 961, 110 S.Ct. 2572,109 L.Ed.2d 753 (1990); Wilson v. State, 551 So.2d 447
(Ala.Cr.App. 1989); Hawkins v. State, 549 So.2d 552
(Ala.Cr.App. 1989).
 V
The appellant next contends that the trial court erred in receiving into evidence a photograph of the victim's body. He maintains that the picture was so gruesome that it resulted in prejudice to him. The photograph showed the body when it was found near the interstate. The body was decomposed. This photograph was received into evidence without objection from defense. Thus, we must determine whether it was plain error to receive the photograph of the victim's body into evidence.
 "Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.' Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. *Page 1045 
denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Woods v. State, 460 So.2d 291
(Ala.Cr.App. 1984); Washington v. State, 415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy's Alabama Evidence § 207.01(2) (3d ed. 1977).
 ". . . . The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury."
Bankhead v. State, 585 So.2d 97, 109 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.), on remand,585 So.2d 133 (Ala.Cr.App. 1991); Ex parte Siebert, 555 So.2d 780
(Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297,111 L.Ed.2d 806 (1990). Lawhorn v. State, 581 So.2d 1159
(Ala.Cr.App. 1990), aff'd, 581 So.2d 1179 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
The state had the burden of proving that the victim was dead, and this photograph was direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence.
 VI
The appellant next argues that the trial court erred in allowing a business card found in the appellant's wallet to be received into evidence at trial. The appellant maintains that the business card was improperly seized. However, this contention is not supported by the facts contained in the record.
The appellant was arrested in California. He was questioned by Mark Winters and Jerome Beck, detectives with the Los Angeles County Sheriff's Department. While the detectives were questioning the appellant, the appellant asked for his wallet, which had already been confiscated, so that he could get the addresses of some people in Birmingham, Alabama, who could vouch for him. While the appellant was going through his wallet, he pulled out a business card from a golf resort in Florida. (The card was the same as the cards that the Mazda owner stated were in the glove compartment of the Mazda. However, this was not known at the time.) Detective Beck testified that he then asked the appellant if he played golf. The appellant answered that he did not. After the appellant finished going through his wallet, the wallet was placed in a plastic bag and heat sealed. It was then sent to Birmingham with the appellant. Corporal Cribs of the Alabama Bureau of Investigation testified that when the wallet arrived in Birmingham, the contents were cataloged, and the business card was removed. By the time that the appellant's wallet was inventoried in Birmingham, the significance of the business card had been established.
The appellant argues that the card was unlawfully taken from his wallet. Items discovered while conducting an inventory search are correctly received into evidence. United States v.Bosby, 675 F.2d 1174 (11th Cir. 1982). Only items which have been illegally seized are subject to the exclusionary rule. SeeEx parte Peoples, 510 So.2d 574 (Ala.), cert. denied,484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987).
As the United States Supreme Court stated in Illinois v.Lafayette, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608,77 L.Ed.2d 65 (1983): "A so-called inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration."
 "At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested person; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A standardized procedure for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. . . . Examining all the items removed from the arrestee's person or possession and listing or inventorying *Page 1046 
them is an entirely reasonable administrative procedure."
462 U.S. at 645, 103 S.Ct. at 2605-06. See also United Statesv. Lipscomb, 435 F.2d 795 (5th Cir. 1971), cert. denied,401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971).
The two requisites that must be met to bring evidence within the inventory exception are: (1) that the person is lawfully arrested and (2) that the inventory was accomplished through standard police procedures. Lafayette, supra. Here, the record shows that the appellant was lawfully arrested in California on a fugitive warrant. In regard to the second requisite, Detective Beck of Los Angeles testified that the procedure of the sheriff's department was not to write down every piece of paper that was in a wallet but to make a cursory search and to put everything in a heat-sealed plastic bag. Corporal Biggs of the ABI testified that it was standard procedure to list all items when conducting an inventory. The search of the appellant's wallet was lawful because it was an inventory search. The business card was lawfully seized as a result of a lawful inventory search. Because the business card was identical to the one in the red Mazda, this fact tended to connect the appellant to the stolen car. No error occurred in this entire procedure.
 VII
The appellant next contends that the trial court erred in permitting an in-court identification of the appellant by one of the prosecution's witnesses. Witness Sarah Harris identified the appellant as the individual she saw enter the Riverchase Omelet Shoppe on the night of the victim's disappearance and talk with the victim. The appellant maintains that the pre-trial identification was unduly suggestive and that therefore Harris's in-court identification should have been suppressed.
Approximately two days after the murder, Harris was shown a photographic array of six men. The state produced six photographs at trial; one of the photographs of the appellant showed the booking number. Neither Harris nor Officer McClellan, who conducted the photographic array, could testify that the booking number was showing when the witness was shown the photographs. McClellan did say that it was not his practice to leave a booking number showing, and it appeared from the photograph that the number had at one time been covered by tape. When she looked at the array, Harris could not positively identify the appellant as the individual she had seen enter the Omelet Shoppe. She did say that he looked like the person, but that she was not 100 percent sure. Harris also could not positively identify the appellant in a line-up. She said that the hair and the complexion did not match the person she had seen. About one week prior to the trial, Harris was shown another photographic array. At this time she positively identified the appellant as the individual who had entered the Omelet Shoppe and had talked with the victim immediately prior to her disappearance.
 "Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967), established a due process right to exclude unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Neil v. Biggers, 409 U.S. 188 [93 S.Ct. 375, 34 L.Ed.2d 401] (1972), established the rule that, where the witness's in-court identification arguably stems from a suggestive out-of-court identification, the question is 'whether under the "totality of circumstances" the identification was reliable even though the confrontation procedure was suggestive,' 409 U.S. at 199 [93 S.Ct. at 382], and whether there was a substantial likelihood of misidentification. Manson v. Brathwaite, 432 U.S. 98 [97 S.Ct. 2243, 53 L.Ed.2d 140] (1977), held that, where a pretrial identification is obtained by a procedure that is both suggestive and unnecessary, 'reliability is the linchpin in determining the admissibility of identification testimony,' 432 U.S. at 114 [97 S.Ct. at 2253], and that the reliability of the identification must be weighed against the corrupting effect of the suggestive identification procedure itself. However, identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality *Page 1047 
of the circumstances indicates its reliability."
Johnson v. State, 453 So.2d 1323, 1327 (Ala.Cr.App. 1984). See also Jones v. State, 431 So.2d 1367 (Ala.Cr.App. 1983). This court, quoting United States v. Briggs, 700 F.2d 408, 412 (7th Cir.), cert. denied, Schlacks v. United States, 461 U.S. 947,103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983), went on further to say in Johnson, " 'It is incumbent upon a defendant to establish that the confrontation procedure in fact was suggestive prior to reaching the threshold "totality of the circumstances" test of reliability.' " 453 So.2d at 1328.
In the instant case there is some question as to whether the pretrial identification procedures were in fact impermissibly suggestive. "Each case is to be considered on its own facts in determining whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."Fitchard v. State, 424 So.2d 674, 676 (Ala.Cr.App. 1982). SeeSimmons v. United States, 390 U.S. 377, 88 S.Ct. 967,19 L.Ed.2d 1247 (1968). Neither the witness nor the officer conducting the identification could state that the booking number on the appellant's picture was showing when the witness was shown the photographs. However, assuming that the pretrial identification procedures were in fact impermissibly suggestive, "[w]hen an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence."Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App. 1989); see also Coleman v. State, 487 So.2d 1380 (Ala.Cr.App. 1986), cert. denied, 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 227 (1991);Jackson v. State, 414 So.2d 1014 (Ala.Cr.App. 1982); Matthewsv. State, 401 So.2d 241 (Ala.Cr.App. 1981), cert. denied,401 So.2d 248 (Ala. 1981). The identification is correctly received into evidence when it "stems from an independent source rather than the photographic lineup." Hutchinson v. State,516 So.2d 889, 893 (Ala.Cr.App. 1987). "Reliability is the linchpin in determining the admissibility of identification testimony."Mullis, 545 So.2d at 209. In the instant case, Harris testified that her attention was attracted to the front of the restaurant when an individual driving a red Mazda automobile almost came through the glass wall of the restaurant while he was attempting to park. She watched the man while he exited the vehicle and entered the restaurant. The individual came into the restaurant and talked to the victim for several minutes. At trial, Harris identified the appellant as this individual. She also described how he had changed from when she saw him two years ago and when he appeared at trial. Her testimony about the appellant's physical appearance was consistent with the testimony of all the other witnesses who identified the appellant. Harris also told the trial court, when the jury was not present, that the reason she did not identify the appellant from the photographic array and a physical line-up was that she was afraid of the appellant. The trial court, after hearing the testimony from the officer and Harris, allowed the in-court identification. No error occurred here. Any allegation that the appellant raises concerning the in-court identification would go to the weight of the evidence and not its admissibility. SeeJennings, supra.
Further, in allowing testimony concerning identifications that are not absolute, this court has held that the quality of a victim's description goes to the "weight and credibility of the victim's identification rather than its admissibility," and thus raises a question of fact for the jury. Jennings v. State,513 So.2d 91, 93 (Ala.Cr.App. 1987).
 VIII
The appellant further argues that the trial court erred in not granting his motion for mistrial when Mitchell Babb said that he moved out of the house he shared with the appellant because he felt that his life was in danger. The following occurred during the questioning of Babb by the prosecution:
 "Q [Prosecutor] — why did you move out, can you tell the ladies and gentlemen of the jury?
"A [Babb] — I felt that my life was in danger.
"Q — Can you elaborate? *Page 1048 
 "Mr. Scofield [Defense Counsel]: I'll object, Your Honor.
"The Court: All right. I'll have to sustain that.
"Mr. Scofield: I'll ask that you instruct —
 "The Court: Jury, if you will, disregard the remarks made by the witness."
The trial court sustained the appellant's objection and instructed the jury to disregard the comment. After Babb testified, the appellant moved for a mistrial. The trial court denied the motion.
 "A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result. Montgomery v. State, 446 So.2d 697, 702
(Ala.Cr.App. 1983), cert. denied, 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984)."
Thompson v. State, 527 So.2d 777, 779 (Ala.Cr.App. 1988).
Further, "It should be only a last resort. . . . Where error is eradicable a mistrial is too drastic and is properly denied." Woods v. State, 460 So.2d 291, 296 (Ala.Cr.App. 1984). In the present case, we believe no reversible error occurred. Immediately after the witness's answer, the trial court instructed the jury to disregard the comment. Considering all the facts and circumstances of this case, the court's instruction was sufficient. See also Barger v. State,562 So.2d 650 (Ala.Cr.App. 1989), cert. denied, 562 So.2d 656 (1990);Garnett v. State, 555 So.2d 1153 (Ala.Cr.App. 1989); Soriano v.State, 527 So.2d 1367 (Ala.Cr.App. 1988); Chillous v. State,405 So.2d 58 (Ala.Cr.App. 1981); Van Antwerp v. State,358 So.2d 782 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978).
 IX
The appellant next contends that the trial court's jury instructions in the guilt phase were flawed. Initially, the appellant contends that the trial court's instructions on reasonable doubt violated the United States Supreme Court holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328,112 L.Ed.2d 339 (1990). Specifically, he maintains that the instruction imposed a higher degree of doubt than that required for acquittal under the reasonable doubt standard. The trial court gave the following instruction:
 "When I say that the State is under the burden of proving guilt beyond reasonable doubt that does not mean that the State must prove an alleged crime beyond every imaginable or speculated doubt or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means the actual substantial doubt arising out of the testimony, or from the lack of the testimony. It is a doubt for which a reason can be assigned."
The terms in Cage, which the United States Supreme Court found to be offensive were "grave uncertainty," "moral certainty," and "actual and substantial doubt." The Supreme Court stated that these terms when used together suggest a higher degree of doubt necessary to acquit than that constitutionally mandated.Cage, 111 S.Ct. at 329. See also Gaskins v. McKellar, ___ U.S. ___, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).
 " 'In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344
(1985). . . . It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on proof below that required by the Due Process Clause.' "
Smith v. State, 588 So.2d 561, 568 (Ala.Cr.App. 1991), quotingCage, 111 S.Ct. at 329-30.
The instruction does not violate the Supreme Court's holding in Cage. This court has recently stated, " 'The mere use of some terminology which happened to also appear in Cage, does not necessarily constitute reversible error.' Earhart v. State,593 So.2d 119, 119 (Ala.Cr.App. 1991)." Herbert *Page 1049 Williams v. State, 627 So.2d 985, 992 (Ala.Cr.App. 1991). See also Smith, supra; Luther Williams, supra; McMillian, 594 So.2d at 1283; Adams v. State, 587 So.2d 1265 (Ala.Cr.App. 1991).
The appellant next contends that the trial court's instructions on intent were incorrect statements of the law. The appellant maintains that the trial court should have given the following instruction: "An accused is not guilty of capital robbery-murder where an intent to deprive the alleged victim of his or her property is formed only after the alleged victim is deceased." The trial court correctly denied this instruction because it is not consistent with Alabama law. As the state correctly argues, the relevant law is thoroughly discussed inHallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd,548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989). We said:
 "The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala. 1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 " 'As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869
(1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute."
 " 'Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. The defendant's intent to rob the victim can be inferred where "the intervening time, if any, between the killing and robbery was part of a continuous chain of events. . . ." ' "
548 So.2d at 534-35, citing Connolly v. State, 500 So.2d 57
(Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986) (citations omitted). The trial court's instructions on the elements necessary to convict the appellant of robbery and intentional murder were sufficient. See Proposed Pattern Jury Instructionsfor Use in the Guilt Stage of Capital Cases Tried Under Act No.81-178 (Alabama Bar Institute for Continuing Legal Education 1982).
The appellant next argues that the trial court erred in not instructing the jury on the lesser included offense of felony-murder. "An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theoryfrom the evidence supporting his position." McMillian, 594 So.2d at 1267. (Emphasis added.) As Judge Bowen stated in Whitev. State, 587 So.2d 1218, 1231 (Ala.Cr.App. 1990), aff'd,587 So.2d 1236 (Ala. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 979, 117 L.Ed.2d 142 (1992):
 " 'The purpose of the felony-murder doctrine is to hold felons accountable for unintended *Page 1050 
deaths caused by their dangerous conduct.' W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986)."
(citations omitted). There was no evidence to support an instruction on felony-murder. In the instant case the evidence revealed that the victim died as a result of manual strangulation. "There is no rational basis for a verdict convicting him of felony-murder." White, 587 So.2d at 1231; §13A-1-9(b), Code of Alabama 1975.
 X
The appellant next contends that various comments made by the prosecutor in his closing arguments in the guilt phase prejudiced him. The appellant contends that the prosecutor commented on his failure to testify, commented on evidence that was not before the jury, gave his personal opinions, and misstated the elements of capital murder. We have reviewed all of the complained-of instances and conclude that no reversible error occurred. "In order for a prosecutor's comments made during argument before the jury to require a new trial, the entire trial must have been so infected with unfairness as a result of these comments that the appellant was denied due process. Darden v. Wainwright, 477 U.S. 168, 181,106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)." Hart v. State,612 So.2d 520, 527 (Ala.Cr.App. 1992). " 'Whatever is in evidence is considered subject to legitimate comment by counsel.' " (Citation omitted.)
Furthermore, the trial court instructed the jury that any arguments of counsel were not to be considered as evidence in the case. " '[A] criminal conviction is not be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.' " Dill v. State,600 So.2d 343, 358 (Ala.Cr.App. 1991), quoting United States v.Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1
(1985). Statements made by counsel in argument to the jury are considered as having been made in the heat of debate. Hendersonv. State, 583 So.2d 276 (Ala.Cr.App. 1990), aff'd,583 So.2d 305 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1268,117 L.Ed.2d 496 (1991). "[I]t is unlikely that any [alleged] impropriety in the State's argument could have affected the jury's verdict." Henderson, 583 So.2d at 287.
 XI
The appellant next contends that the trial court erred in allowing the victim's mother to testify at trial. The victim's mother identified a picture of the victim, identified jewelry that the victim commonly wore, identified the watch found on the victim, identified the personal effects that the victim had left behind when she left the Omelet Shoppe, and testified that after Tammy's disappearance she filed a missing persons report. Specifically, the appellant maintains that the very presence of the victim's mother on the stand inflamed the jury and denied him a fair trial. Because no objection was made at trial to the victim's mother's testimony we must determine whether her testimony could constitute plain error. The testimony was relevant to the state's case and was correctly received into evidence. See Luther Williams, supra. No plain error occurred here.
The appellant also contends that he was prejudiced by the fact that the victim's sister cried when she was on the stand. A brief loss of composure by the family of the victim does not "unduly prejudice" the appellant. Henderson, 583 So.2d at 287. A perpetrator of a homicide should reasonably expect his victim's loved ones to mourn their loss. No reversible error occurred here.
 XII
The appellant next argues that several instances of prosecutorial misconduct in the closing argument in the penalty phase resulted in prejudice to him. In each instance cited by the appellant, no objection was made. " 'This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be *Page 1051 
particularly harmful.' " Kuenzel, 577 So.2d at 489.
The first instance was when the prosecutor stated that the victim had died a "humiliating" death. "[A prosecutor] may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way."Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App. 1986).
The next instance occurred when the prosecutor told the jury that the victim worked for a living and that she had a 21-month-old son. Evidence concerning these facts was presented during the course of the trial and was a correct subject for comment by the prosecutor in his closing argument. "Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead, 585 So.2d at 97.
The appellant also argues that the following comment incorrectly urged the jury not to use sympathy in their decision making:
 "We don't want vengeance at all. Nobody ever asked for vengeance, and I hope I haven't insinuated that in any manner. We don't want vengeance. And I speak on behalf of everybody connected with this case. We want you to be fair to that defendant right there. I want you to be fair. I want you to have the same amount of mercy on him when you go back there and deliberate his fate that he had on Tammy Hogeland the morning of the 18th out there on that bank on the side of I-59 when he strangled the life out of her. That's all we ask. If you will do that, show him the same amount of mercy he showed Tammy, you will return a death penalty recommendation in this case."
This court addressed a similar argument in Kuenzel, supra. Judge Bowen stated:
 "[I]n California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court decided that 'an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penal phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' 479 U.S. at 539, 107 S.Ct. at 838."
Kuenzel, 577 So.2d at 496, (emphasis added in Kuenzel). See also Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257,108 L.Ed.2d 415 (1990).
 "On the basis of these decisions, we find no plain error in the prosecutor's comments against mercy and sympathy. 'In order to obtain relief [from an alleged misstatement of the law by a prosecutor], . . . petitioner must show that: (1) the prosecutor in fact misstated the law; and (2) the misstatement rendered the trial fundamentally unfair.' "
Kuenzel, 577 So.2d at 498 (quoting Harich v. Wainwright,813 F.2d 1082, 1091 (11th Cir. 1987), aff'd on rehearing,844 F.2d 1464, 1468-69 (11th Cir. 1988), cert. denied, 489 U.S. 1071,109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). The prosecutor's comments were not incorrect statements of the law. No error occurred here.
The appellant further argues that the following comment was prejudicial:
 "[Y]es, I will ask you to return a death penalty in this case, because the State of Alabama knows and feels that that's a deterrent in these kind of cases. And I feel good about asking you to send out deterrent messages, because the minute you come back and recommend the death penalty, it will be all over this County in short order, and the State, and this general area, that the juries in St. Clair County are not going to tolerate people being strangled to death and robbed in St. Clair County, Alabama. It will go out, and it will be a good message, and it will deter the future Mark Allen Jenkinses that might consider doing the same thing."
This court stated in Rutledge v. State, 523 So.2d 1087
(Ala.Cr.App. 1987), rev'd on other grounds, 523 So.2d 1118
(Ala. 1988):
 "It is proper to argue deterrence in a sentencing phase closing argument. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); Ex parte Waldrop, 459 So.2d 959 *Page 1052 
(Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982); Cook v. State, 369 So.2d 1243 (Ala.Cr.App. 1977), aff'd in part, rev'd in part on other grounds, 369 So.2d 1251
(Ala. 1978). It is appropriate for a jury, in deciding whether to impose the death penalty, to consider whether or not the general deterrence purpose of the statute would be served thereby. Brooks v. Kemp."
523 So.2d at 1100.
The comment made by the prosecutor in his closing argument in the sentencing phase was not error.
 XIII
The appellant next argues that the trial court erred in its findings concerning aggravating and mitigating circumstances. The trial court found two aggravating circumstances that applied — that the murder was committed during the course of a robbery and during the course of a kidnapping. Section13A-5-49(4), Code of Alabama 1975. The court found no other aggravating circumstances. The court also found, as statutory mitigating circumstances, that the appellant had no significant history of prior criminal activity and that he was 20 years old at the time of the offense. Sections 13A-5-51(1) and (7), Code of Alabama 1975.
Initially, the appellant contends that the trial court erred in finding as two aggravating circumstances that the murder was committed during the course of a robbery and during the course of a kidnapping. However, these two circumstances had already been proven in the guilt phase beyond a "reasonable doubt." The trial court committed no error in finding these two aggravating circumstances. See Luther Williams, supra.
The appellant also argues that the trial court erred in finding that several mitigating circumstances were not present. He maintains that the court should have found as statutory mitigating circumstances that the victim was a participant in the appellant's conduct (§ 13A-5-51(3)) and that the appellant lacked the capacity to appreciate the criminality of his conduct (§ 13A-5-51(6)).
Section 13A-5-51(3) was not intended to apply to a situation such as the one involved in the instant case. That section is intended to apply to instances where the individual killed is an active participant in the crime underlying the killing. For instance, two people enter a bank to commit a robbery and during the robbery, one of the robbers kills the other.Dill, 600 So.2d at 362.
The trial court also determined that §-13A-5-51(6) did not apply, given the facts of the case. The trial court stated in its order that:
 "The Court does find that there was evidence that the defendant, at some time during the night of April 17th or morning of April 18th had consumed alcoholic beverage, but the Court does not find that at the time of the commission of the capital offense the capacity of the defendant to appreciate the criminality of this conduct or to conform his conduct to the requirements of law was substantially impaired. The Defendant's conduct, at approximately 5:00 a.m. on the 18th at the service station, and his conversation with the two Coe witnesses and his later recollection of the events that occurred surrounding the commission of the offense, would indicate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired to the extent as required in this mitigating circumstance."
"[V]oluntary intoxication will not constitute grounds for the mitigating circumstance in this case. The appellant simply did not show that he was so intoxicated as to have rendered himself incapable of appreciating his conduct." Thompson v. State,503 So.2d 871, 881 (Ala.Cr.App. 1986), aff'd, 503 So.2d 887 (Ala. 1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204,98 L.Ed.2d 155 (1987). See also Ex parte Jones, 520 So.2d 553 (Ala. 1988), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151
(1988); Colquitt, Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213 (1982). The trial court's findings in this regard are supported by the record and are correct. *Page 1053 
The appellant also contends that the trial court erred in failing to find any non-statutory mitigating factors. The trial court's findings show that the court considered all of the evidence that the appellant presented as possible nonstatutory mitigating evidence and found no nonstatutory mitigating circumstances.
 " 'It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.' "
McWilliams v. State, [Ms. 6 Div. 190, Aug. 23, 1991], 1991 WL 184448, *3 (Ala.Cr.App. 1991) (citation omitted). We have reviewed the evidence presented at the sentencing hearing and believe that the trial court committed no error in finding no nonstatutory mitigating circumstances in the present case.
 XIV
As required by §-13A-5-53, Code of Alabama 1975, this court must review the propriety of appellant's conviction and sentence to death. The appellant was indicted and was convicted of capital murder as defined in §§ 13A-5-40(a)(1) and13A-5-40(a)(2), Code of Alabama 1975, i.e., murder during the course of a kidnapping and during the course of a robbery.
A review of the record shows that the appellant's sentence was not the result of any influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1), Code of Alabama 1975.
The trial court found, as aggravating circumstances, that the murder was committed during the course of a kidnapping and during the course of a robbery. Sections 13A-5-40(a)(1) and13A-5-40(a)(2). The court found as a matter of mitigation that the appellant had no significant history of prior criminal activity and that he was 20 years old at the time of the murder. Sections 13A-5-51(1) and 13A-5-51(7). The trial court weighed the aggravating and the mitigating circumstances and found the aggravating circumstances to outweigh the mitigating ones. The court's finding are supported by the evidence presented at trial.
As required by § 13A-5-53(b)(2), Code of Alabama 1975, we must independently weigh the aggravating and the mitigating circumstances to determine whether the appellant's sentence to death was appropriate. We have weighed all of the evidence presented and are convinced that the appellant's sentence to death is appropriate in the present case and that the aggravating circumstances outweigh the mitigating ones.
Section 13A-5-53(b)(3), Code of Alabama 1975, states that this court must determine whether the appellant's sentence is disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant's sentence to death was neither disproportionate nor excessive. See Luther Williams, supra; Kuenzel, supra; Dill, supra; Henderson, supra. See alsoWhisenhant v. State, 555 So.2d 219 (Ala.Cr.App. 1988), aff'd555 So.2d 235 (Ala. 1989), cert. denied, 496 U.S. 943,110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); Thompson v. State,542 So.2d 1286 (Ala.Cr.App. 1988), aff'd 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161
(1989).
Finally, as required by Rule 45A, A.R.App.P., we have searched the record for any error that may have adversely affected the appellant's substantial rights and have found none.
The appellant received a fair trial. The appellant's conviction and sentence to death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] It was later determined that the red sports car had been stolen. *Page 1054